## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

_____

)
MACHELLE JOSEPH,                            )
                                            )
        Plaintiff,                          )
                                            )
    v.                                      )
                                            )
BOARD OF REGENTS OF                         )
THE UNIVERSITY SYSTEM                       )
OF GEORGIA;                                 )
GEORGIA TECH ATHLETIC                       )     Civil Action No.:
ASSOCIATION;                                )
GEORGE P. PETERSON, in his individual       )
capacity; M. TODD STANSBURY, in his         )
individual capacity; MARVIN LEWIS, in       )     JURY TRIAL DEMANDED
his individual capacity; and                )
SHOSHANNA ENGEL, in her individual          )
capacity.                                   )
                                            )
        Defendants.                         )
_____)

## COMPLAINT

## PRELIMINARY STATEMENT AND INTRODUCTION

1.     Plaintiff MaChelle Joseph ("Coach Joseph") is the former Head

Coach of the Georgia Institute of Technology ("GT") Women's Basketball

("WBB") Team, which she successfully led for sixteen years – amassing more

wins than any coach in GT WBB history and earning the admiration and respect of players, alumni, and donors.

2.      On March 26, 2019, GT Athletic Director Todd Stansbury abruptly terminated Coach Joseph's employment, allegedly for engaging in extreme and abusive coaching practices.

3.      Coach Joseph's coaching style, while tough at times, was neither extreme nor abusive.

4.      During her sixteen years as Head Coach, Coach Joseph advocated on a near daily basis to ensure that her team and her players were treated fairly and equally and not subjected to mistreatment.

5.      Coach Joseph regularly advocated for locker rooms and practice facilities that were of similar quality, size and accessibility as GT provided to the Men's Basketball ("MBB") Team to ensure that her players could prepare properly and comfortably for practices and games, and would be viewed by potential recruits as commensurate with facilities in other institutions.

6.      Coach Joseph regularly advocated for marketing and publicity resources of similar quality and kind as GT provided to the MBB team to ensure that her players received the attention necessary to highlight the teams' accomplishments, drive ticket sales, and attract recruits.

2

7. Coach Joseph regularly advocated for resources similar to what was provided to the MBB team for hiring qualified assistant coaches and staff to ensure that her players received the best training and guidance, and that she had appropriate assistance to be the most effective coach for her team.

8. Coach Joseph advocated for travel resources similar to what GT provided to the MBB team to ensure that her players traveled by the most convenient modes of transportation, were well-rested, and made it to their destination – be it class, practice, or games – on time.

9. Coach Joseph worked hard to ensure that her players, about whom she cared deeply, reached their full potential both on and off the court by setting high standards and employing demanding, yet fair, coaching practices so that her players were equipped to compete in one of the most competitive college conferences in the country, while also excelling as students at one of the top-ranked public universities in the country.

10. It was because of Coach Joseph's efforts to advocate on behalf of WBB and protect her players from mistreatment – not subject them to it – that GT's new athletic administration embarked on a campaign of retaliation and harassment that ultimately ended her career as Head Coach.

3

11.   GT has claimed that it terminated Coach Joseph because she allegedly engaged in abusive coaching practices.  This explanation is a pretext for the discriminatory and retaliatory bias that drove GT's decision to terminate Coach Joseph's employment, just as her team was on the brink of earning a berth in the NCAA tournament.  GT's purported reason for the termination is a classic example of the pervasive double standard that exists in collegiate athletics, where a female coach such as Coach Joseph is penalized for employing the same demanding (and effective) coaching practices that are regularly used by male coaches without consequence.

12.   GT's gender bias not only resulted in the WBB receiving fewer benefits and resources than the MBB team, it also resulted in Coach Joseph being driven from a career that she loved and in which she excelled.

13.   Coach Joseph files this Complaint for declaratory, injunctive, and monetary relief against Defendants Board of Regents of the University System of Georgia and Georgia Tech Athletic Association collectively "the Institutional Defendants," for sex discrimination and retaliation in violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a) ("Title IX") and the Georgia Whistleblower Act, O.C.G.A. § 45-1-4 ("GWA"); against President George P. Peterson, Athletic Director Todd Stansbury, Associate Athletic Director of

4

Administrative and Finance Marvin Lewis, and Associate Athletic Director of Compliance Shoshanna Engel, in their individual capacities (collectively the "Individual Defendants") for sex discrimination in violation of the Fourteenth Amendment of the United States Constitution, 42 U.S.C. § 1983; against the Institutional Defendants for breach of contract in violation of Georgia law; and against the Institutional Defendants and Individual Defendants for litigation expenses under O.C.G.A. § 13-6-11.[1]

## JURISDICTION AND VENUE

14.     This Court has jurisdiction over Counts 1-4 and Count 6 pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3)-(4), as this matter contains a federal question. This Court has supplemental jurisdiction over Counts 5, 7 and 8 state law claims under 28 U.S.C. § 1367(a) as they arise out of a common nucleus of operative facts as the federal law claims.

15.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(a)(1) and (b)(2), as a substantial number of the events, acts, or omissions giving rise to Coach Joseph's claims occurred within the boundaries of this judicial district.

---

[1] Coach Joseph has timely filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC") and upon receipt of a Right to Sue letter will timely seek leave to amend this Complaint to add counts for sex discrimination, retaliation, and retaliatory hostile work environment under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*

5

## PARTIES

16.    Coach Joseph is a citizen of the United States and an adult resident of the State of Florida.  She was employed by GT and Defendant GTAA from approximately June 2001 to March 26, 2019, serving most recently as the Head Coach of the GT Women's Basketball Team.

17.    GT is a member institution of the University System of Georgia. Pursuant to O.C.G.A. § 20-3-51, Defendant Board of Regents of the University System of Georgia ( "BOR") is vested with the government, control, and management of the University System of Georgia and all of its institutions, including GT.  BOR receives federal financial assistance and is therefore subject to Title IX's prohibitions against sex discrimination and retaliation.  As a board of the state which employs or appoints a public employee or public employees, BOR is a "public employer" within the meaning of the GWA.  Defendant BOR is subject to the jurisdiction of this Court and may be served with process and the Complaint by delivering a copy of the Summons and Complaint to Dr. Steve Wrigley, Chancellor of the Board of Regents of the University System of Georgia, 270 Washington Street, S.W., Suite 7025, Atlanta, Georgia 30334; by delivering a copy of same to Samuel C. Burch, Vice Chancellor for Legal Affairs, at the same address; and by delivering a copy of same to the Office of the State Attorney General.

18.   Defendant Georgia Tech Athletic Association, Inc. ("Defendant GTAA") is a non-profit corporation organized and existing under Georgia law that administers the intercollegiate athletic programs of GT.  Defendant BOR and GT provide institutional funding to support Defendant GTAA. The primary purpose of Defendant GTAA is to promote the educational programs of GT through student body participation in "healthful exercises, recreations, athletic games and contests." Although GTAA is a separate entity from GT, its role of providing the intercollegiate athletic programs at GT is functionally indistinguishable from the role that athletic departments of other major U.S. universities provide for their respective universities. Defendant GTAA indirectly receives federal financial assistance and is therefore subject to Title IX's prohibitions against sex discrimination and retaliation.  As an agency of a state-funded higher educational institution that appoints or employs public employees, Defendant GTAA is also a "public employer" within the meaning of the GWA.  Defendant GTAA can be served with legal process and the Complaint by delivering a copy of the Summons and Complaint to its registered agent GT Associate Athletic Director of Compliance Shoshanna Engel, 150 Bobby Dodd Way, Atlanta, Georgia 30332-0455.

19.     Defendant George P. Peterson ("Defendant Peterson") is the President of GT.   He has ultimate responsibility and authority for the operation, fiscal integrity, and personnel of GT's athletic program.   He also has responsibility for ensuring that GT's "athletic programs are in compliance with all applicable federal and state laws, in compliance with the regulations of any athletic conference affiliation, and that the mission, values, and goals of the athletics program are compatible with those of the institution."

20.     At all relevant times, Defendant Peterson had the power and authority to direct the Institutional Defendants to allocate financial resources to Coach Joseph and the WBB team in an equitable manner, and to address Coach Joseph's complaints of sex discrimination and retaliation.   Defendant Peterson failed to direct the Institutional Defendants to allocate financial resources to Coach Joseph and the WBB team in an equitable manner, and responded with deliberate indifference to Coach Joseph's complaints of discrimination and retaliation.   He is being sued pursuant to 42 U.S.C. § 1983 in his individual capacity.   Defendant Peterson can be served with legal process and the Complaint by delivering a copy of the Summons and Complaint to Defendant Peterson at the Georgia Institute of Technology, Office of the President, 225 North Avenue, N.W., Atlanta, Georgia 30332-0455.

8

21.   Defendant M. Todd Stansbury ("Defendant Stansbury") is the Director of Athletics at GT, and the Chief Executive Officer of Defendant GTAA, and in this capacity, regularly transacts business in Fulton County, Georgia.  He is being sued pursuant to 42 U.S.C. § 1983 in his individual capacity.  Defendant Stansbury can be served with legal process and the Complaint by delivering a copy of the Summons and Complaint to Defendant Stansbury at 150 Bobby Dodd Way, First Floor, Administrative Offices, Atlanta, Georgia, 30332.

22.   Defendant Marvin Lewis ("Defendant Lewis") is the Associate Athletic Director of Administration and Finance at GT, and in this capacity, regularly transacts business in Fulton County, Georgia.  He is being sued pursuant to 42 U.S.C. § 1983 in his individual capacity.  Defendant Lewis can be served with legal process and the Complaint by delivering a copy of the Summons and Complaint to Defendant Lewis at 150 Bobby Dodd Way, First Floor, Administrative Offices, Atlanta, Georgia, 30332.

23.   Defendant Shoshanna Engel ("Defendant Engel") is the Associate Athletic Director of Compliance and Deputy Title IX Coordinator at GT, and in this capacity, regularly transacts business in Fulton County, Georgia.  She is being sued pursuant to 42 U.S.C. § 1983 in her individual capacity.  Defendant Engel can be served with process and the Complaint by delivering a copy of the Summons

9

and Complaint to Defendant Engel at 150 Bobby Dodd Way, First Floor, Administrative Offices, Atlanta, Georgia, 30332.

## FACTUAL ALLEGATIONS

### Prior to Her Abrupt Termination, Coach Joseph Was a Long-Term, High Performing Coach at GT.

24.     GT and Defendant GTAA hired Coach Joseph in approximately June 2001 as an Assistant Coach on the WBB team.

25.     In May 2003, GT and Defendant GTAA promoted Coach Joseph to Head Coach of the WBB team.

26.     In her first year as Head Coach, Coach Joseph assembled the highest-rated freshman class in school history and tied the records for most overall and conference victories by a first-year head coach at GT.

27.     Over the next decade, Coach Joseph continued to break records and elevate the WBB team, including more than tripling GT's appearances in the National Collegiate Athletic Association ("NCAA") tournament – increasing the Institute's record from two appearances in the 40 years prior to her arrival to seven in her first 10 years as Head Coach – by the end of the 2013-2014 season.

28.     Based on Coach Joseph's success, Defendant GTAA, on October 20, 2014, entered into a contract with Coach Joseph (the "Employment Contract"),

pursuant to which Georgia Tech agreed to employ Coach Joseph as Head Coach of the GT WBB team for another six years, or until March 31, 2020.

29.    According to Article II of the Employment Contract, Coach Joseph was responsible for planning, developing, administering, and evaluating the GT WBB program.  This included, *inter alia*:

a.    Developing, supervising, and conducting the recruitment program for student-athletes;

b.    Overseeing basketball team and staff activity relating to public relations and promotions functions for the basketball program;

c.    Cooperating with the Athletic Communications and Public Relations staff in the preparation of brochures, programs, statistical reports, and press release in support of the basketball program; and

d.    Recruiting, directing, supervising, and evaluating assistant basketball coaches and related support personnel.

30.    In exchange for performing these duties, Defendant GTAA agreed to pay Coach Joseph a base salary, a personal appearance and speaking fee, performance-based bonuses, and longevity bonuses payable at two intervals over the life of her contract.  *See* Exhibit A at Articles I, III.

31.    At the time of her termination, Coach Joseph's base salary was $350,000, her personal appearance and speaking fee was $300,000 and she would have been entitled to a $100,000 longevity bonus on April 30, 2020, had she remained employed through March 31, 2020.   *See* Exhibit A at Articles I, III.

32.    Under Article VII of the Employment Contract, Defendant GTAA could only terminate the Employment Contract without financial penalty prior to March 31, 2020 for "good cause."

33.    A true and correct copy of the Employment Contract is attached hereto as Exhibit A and is incorporated herein by reference.

34.    From 2014 to her termination, Coach Joseph's success as Head Coach continued as she assembled top recruiting-classes year after year, including a top-10 class in 2018 that included two McDonald's All-Americans, and led the WBB team to over 300 wins.

35.    At the time of her termination, Coach Joseph was the winningest coach in the history of GT WBB.

### The Defendants Discriminated Against Coach Joseph and the WBB Team on the Basis of Sex.

36.    Throughout Coach Joseph's employment, GT and Defendant GTAA provided her and the WBB team significantly fewer benefits and resources than it provided to the Men's Basketball ("MBB") team, thereby denying the WBB team

equal athletic opportunity in violation of Title IX of the Education Amendments Act of 1972 ("Title IX") and its implementing regulations.

37.   Title IX prohibits discrimination on the basis of sex in education programs receiving Federal financial assistance.

38.   Athletics are considered an integral part of an institution's education programs and are covered under Title IX.

39.   To comply with Title IX's prohibition against discrimination on the basis of sex in athletics, a recipient that "operates or sponsors interscholastic, intercollegiate, club, or intramural athletics" must "provide equal athletic opportunity for members of both sexes."  34 C.F.R. § 106.41(c) (Oct. 17, 1979).

40.   Whether equal athletic opportunities are available to both sexes depends on an evaluation of the institution's relative treatment of teams of different sexes in different program areas, including the provision of equipment and supplies; scheduling of games and practice times; travel and per diem allowance; opportunities to receive coaching and academic tutoring; assignment and compensation of coaches and tutors; provision of locker rooms, practice and competitive facilities; provision of medical and training facilities and services; provision of housing and dining facilities and services; and publicity.  34 C.F.R. § 106.41(c)(1)-(10) (Oct. 17, 1979).

41.     While Coach Joseph believes that GT and Defendant GTAA failed to provide her and her team equivalent benefits and resources in virtually all of the program areas outlined in the Title IX regulations, her primary concerns during her employment related to four areas:  (1) provision of locker rooms; practice and competitive facilities; (2) publicity and marketing; (3) assignment and compensation of coaches; and (4) travel.

## Provision of Locker Rooms and Other Facilities

42.     GT and Defendant GTAA provided Coach Joseph and the WBB team locker rooms and other facilities that were substantially inferior to that which it provided to the coaches of the MBB team.

43.     The locker rooms for the GT WBB and MBB teams are located between McCamish Pavilion ("McCamish"), where the basketball teams compete, and Zelnak Basketball Center ("Zelnak"), where the basketball teams practice.

44.     The locker rooms GT and Defendant GTAA provided to Coach Joseph and the WBB team were of substandard quality.  As of the time of her termination, GT had not made any major upgrades to the WBB locker rooms during Coach Joseph's 18-year tenure, and made only occasional minor improvements, such as converting a small storage space to an academic room and

laying new carpet.  Apart from the new carpet, Coach Joseph and the WBB team had to fundraise for most minor improvements.

45.     In the absence of any meaningful upgrades, the GT WBB lockers, as of the time of Coach Joseph's termination, were dated, small, weathered, broken and frequently did not lock.  The laundry space was small, with only one washer, one dryer, and one laundry bin for the entire WBB team.  The WBB coaching staff shared one locker room and shower space for both the female and male coaches. In addition to these deficiencies, the outdated state of the WBB locker rooms required regular upkeep and maintenance that also fell to Coach Joseph and her staff to address.

46.     By contrast, GT and Defendant GTAA provided the MBB team with locker rooms that were larger than the WBB locker room, and which they regularly upgraded, including with each major coaching change since 2011.  These upgrades included a new head coach office space in the MBB locker room area; new lockers; a new game room with TVs, gaming systems, a pool table, and leather furniture; a new lounge with comfortable furniture; a new family/recruiting space; a new kitchen/nutrition space with a bar; a new cold tub; upgraded training and equipment space; upgraded laundry space with three washers, four dryers, and

individual laundry lockers;  a built-out recovery space with three customized recovery chairs; and two sets of individual lockers.

47.     On information and belief, the MBB team and coaches did not have to use fundraising dollars for most of these upgrades.

48.     The GT MBB locker room facilities were also more accessible to the Zelnak practice facilities and provided more amenities to MBB coaching staff. Since the McCamish renovation in 2011, the MBB locker room has had a door that provides the MBB team direct access to Zelnak, while the GT WBB locker room has no such door.  Instead, to access Zelnak from their locker room, the WBB team has to either travel through the MBB locker room, travel through the Callaway Club hospitality suites, or go outside and enter Zelnak from the front door.

49.     Because walking through the MBB locker room is frequently not feasible, the layout of the WBB and MBB locker rooms in relation to Zelnak creates a number of issues for the WBB team, including making it more difficult for the WBB team to access the video room, which is adjacent to the MBB locker room.

50.     The MBB coaches also have a dedicated office in the MBB locker room, while the WBB coaches have no such dedicated office in the WBB locker room.

16

51.    In addition, there was a significant disparity between the office space GT and Defendant GTAA provided to the coaches of MBB and WBB.  Although the offices for the coaches were located in the same building (Edge), the WBB office space was small, outdated, and shared with the swim team coaching staff. Due to the lack of space, some of the WBB assistant coaches had to sit at desks in the hallway, while two other WBB staff members shared an office.

52.    By contrast, the MBB office space was approximately double the size of the WBB office space, taking up an entire wing of the Edge building, with an upgraded conference room equipped with new technology, a re-branded space for the new coaches, and its own video conference room.  Each MBB staff member also had their own dedicated office.

53.    While GT and Defendant GTAA recently committed to upgrading the WBB and MBB locker rooms, the requirements that GT and Defendant GTAA placed on Coach Joseph and MBB Head Coach Josh Pastner to obtain those upgrades further underscored GT's and Defendant GTAA's disparate treatment of her and Coach Pastner, and their teams, in this area.

54.    In October 2016, Georgia Tech informed Coach Joseph and Coach Pastner that it had hired an architect to make upgrades to their respective locker rooms.  After a year had passed with no progress on the upgrades, Coach Joseph

17

obtained authorization from Defendant Stansbury to fundraise $2.75 million for the necessary upgrades for the WBB locker rooms.  While Coach Joseph fundraised for the WBB locker room upgrades, including attending sometimes as many as three fundraising dinners a week, Coach Pastner made no effort to fundraise for the MBB locker rooms and told Defendant Stansbury that if Georgia Tech did not have enough money to do both, then it should give the money to the WBB team.

55.     GT and Defendant GTAA did not follow this recommendation from Coach Pastner.  Instead, after Coach Joseph had spent many months raising nearly all of the $2.75 million, GT and Defendant GTAA simply designated $2.5 million from a large unassigned donor gift toward the MBB locker rooms.

56.     While Coach Joseph was frustrated that GT and Defendant GTAA had required her to fundraise for the upgrades to the WBB locker room but placed no such requirements on Coach Pastner, she thought this donation would ensure the timely upgrade of the WBB locker rooms that she and the WBB team desperately needed.  But that was not the case.

57.     In January 2019, the donation to the MBB locker room fell through, and GT and Defendant GTAA delayed the upgrades to the WBB locker rooms again until an anonymous donor donated sufficient funds to upgrade the MBB locker rooms at the same time.

58.    At the time of Coach Joseph's termination, GT and Defendant GTAA had still not upgraded the WBB locker rooms.

59.    GT's and Defendant GTAA's failure to provide Coach Joseph and the WBB team locker rooms and other facilities of similar quality and accessibility denied the WBB team equal athletic opportunity and negatively impacted the terms and conditions of Coach Joseph's employment.  GT's and Defendant GTAA's disparate treatment of the WBB team and Coach Joseph in this program area denied the WBB team access to quality locker rooms;  required Coach Joseph to devote a substantial portion of extra time to fundraising for basic improvements; created significant impediments for Coach Joseph and the WBB on men's game days, when she and the team had to go through the Callaway Club or walk outside to reach practice;  and significantly hampered Coach Joseph's ability to recruit premier players and build her program, which in term limited her compensation, a portion of which was tied to her ability to build and coach teams to various collegiate tournaments.

60.    Based on information and belief, Defendants Peterson, Stansbury, and Lewis had the power and authority to allocate financial resources to improve the quality and accessibility of the WBB locker rooms and other facilities, but chose

not to allocate them to Coach Joseph and the WBB team because of Coach Joseph's sex and/or the sex of the athletes she coached.

## Publicity

61.    GT and Defendant GTAA provided Coach Joseph and the WBB team resources for marketing and publicity that were substantially inferior to that which it provided the coaches of the MBB team and male MBB team.

62.    During her last decade of employment, GT and Defendant GTAA limited the WBB team's marketing budget to $22,000 and provided it no money for external advertisements such as articles, billboards, radio and TV appearances, or digital marketing.  In contrast, Defendant GTAA provided the MBB team with its own marketing budget in addition to using funds from a general marketing account to support the MBB team's external advertising efforts.  Coach Joseph repeatedly asked Defendant Lewis to ensure that Defendant GTAA spent funds from the general marketing account to support the WBB team's marketing efforts, but Defendants Lewis and GTAA never provided such support.

63.    The money that GT and Defendant GTAA allocated to WBB for marketing was not only significantly less than what GT and Defendant GTAA spent on the MBB team for marketing, as discussed below, but based on a 2017-2018 survey conducted by the senior women administrators in the Atlantic Coast

20

Conference ("ACC"), it also consistently ranked below the average marketing budget ($40,500) for women's basketball in the ACC.

64.     Without sufficient marketing funds, Coach Joseph was unable to hire even one employee dedicated to marketing the team during her employment as Head Coach, making her the only basketball coach among the coaches who responded to the 2017-2018 ACC survey without a full-time employee or intern responsible for marketing.  Without the support of a dedicated marketing team, Coach Joseph was forced to dedicate other resources to GT WBB marketing efforts – either by marketing the team herself or by allocating a portion of her fundraising or assistant coach salary budget to hire part-time help.

65.     By contrast, GT and Defendant GTAA provided the coaches of the MBB team more marketing dollars annually than it provided to Coach Joseph and the WBB team.   With this money, the MBB team was able to support sizeable marketing and advertising efforts throughout the season, including multiple billboards, radio appearances, media engagements, a coach's show, and significant product giveaways highlighting former GT MBB players.  These efforts increased attendance, and therefore revenue, for MBB.

66.     In addition to allocating minimal marketing dollars to Coach Joseph to market the WBB team, GT also provided only minimal institutional support for the

achievements of WBB team, such as announcing the team's accomplishments on its website.  For instance, in 2018, Coach Joseph secured a top-10 recruiting class, including two McDonald's All-American players.  GT initially made no effort to promote this accomplishment on its website or on social media.  After Coach Joseph and WBB donors inquired about GT's failure to publicize this significant achievement, GT eventually put out a short release on its website.

67.    To make up for the lack of institutional support in this area, many of the WBB players started to publicize their own successes on Twitter, after seeing the Tweets, newsletters and web posts that GT put out on behalf of the MBB team (but not WBB).

68.    GT's and Defendant GTAA's failure to allocate adequate funds to the WBB team for publicity and marketing was made worse by GT's and Defendant GTAA's lack of support for the sale of WBB ticket sales.  GT and Defendant GTAA used an outside sales group, Aspire Group, to sell MBB home game tickets while WBB had no access to Aspire Group or any other external sales operation. Further, while GT and Defendant GTAA provided additional benefits to MBB premium seat holders, such as parking, food, and alcohol, and access to the Callaway Club, it provided no similar benefit to WBB premium seat holders despite Coach Joseph's repeated requests for it.

22

69.    GT's and Defendant GTAA's failure to provide Coach Joseph the resources to market and promote the WBB at the same level it promoted the MBB team denied the WBB team equal athletic opportunity and negatively impacted the terms and conditions of Coach Joseph's employment.   GT's and Defendant GTAA's failure impeded Coach Joseph's ability to implement and oversee promotional activities for her program; this in turn, inhibited her ability to attract fans and sell tickets, consistently depressing game attendance to among the lowest in the ACC for fiscal year 2018.  The inferior publicity and marketing resources GT and Defendant GTAA provided Coach Joseph and the WBB team also inhibited her ability to recruit top talent, unnecessarily depleted her fundraising proceeds, and required her to expend extra hours and energy to obtain basic support in this necessary program area.

70.    Based on information and belief, Defendants Peterson, Stansbury, and Lewis had the power and authority to allocate financial resources to improve the marketing resources for the WBB team, but chose not to allocate them to Coach Joseph and the WBB team because of Coach Joseph's sex and/or the sex of the athletes she coached.

**Assignment and Compensation for Coaches and Staff**

71.    GT and Defendant GTAA provided Coach Joseph and the WBB team resources for coaches and staff that were substantially inferior to that which it provided the coaches of the MBB team and male MBB team.

72.    Over the years, and particularly since fiscal year 2016, GT and Defendant GTAA allocated Coach Joseph significantly less for assistant coach salaries than they granted head coaches of the MBB team.  For example, the money GT and Defendant GTAA allocated to the head coaches of the MBB team to hire assistant coaches has remained consistent or higher year over year, including a 35 percent increase for assistant coach salaries for fiscal year 2017.

73.    In contrast, at the time of Coach Joseph's termination, the money GT and Defendant GTAA allocated to her to hire assistant coaches for the WBB program was approximately two percent less than what it was in fiscal year 2016.

74.    GT's and Defendant GTAA's failure to provide Coach Joseph a budget sufficient to afford a similar level of coaching staff (quality and quantity) relative to the MBB team denied the WBB team equal athletic opportunity and negatively interfered with the terms and conditions of Coach Joseph's employment.  It inhibited Coach Joseph's ability to recruit and retain qualified assistant basketball coaches, which in term resulted in her losing desired coaches to

other Power 5 schools, hiring lesser quality coaches and staff, and using her fundraising budget to augment salaries or hire coaches, all of which hampered her ability to develop and administer the WBB program.

75.     Based on information and belief, Defendants Peterson, Stansbury, and Lewis had the power and authority to allocate financial resources to improve the WBB team's assistant coach and staff salary pool, but chose not to allocate them to Coach Joseph and the WBB team because of Coach Joseph's sex and/or the sex of the athletes she coached.

## Travel

76.     GT and Defendant GTAA provided Coach Joseph and the WBB team resources for travel that were substantially inferior to that which it provided the coaches of the MBB team and male MBB team.

77.     Over the years, GT and Defendant GTAA allocated the WBB team less money for travel as compared to the MBB team.  In 2007, for instance, the team travel budget for WBB team was $225,000 less than the travel budget for the MBB team.

78.     In addition, the WBB team's travel budget was not only consistently smaller than the MBB team's budget, but historically had ranked in the bottom half

of ACC teams and was $200,000 less than the top teams in the ACC during Coach Joseph's last year at GT.

79.     The difference in budgets resulted in the WBB team traveling via less desirable and more inconvenient modes of transportation relative to the MBB team, including traveling in coach class on international flights while the MBB traveled in first class, and traveling by commercial airline for some games while the MBB almost always traveled by charter plane.  In addition, while GT and Defendant GTAA permitted the MBB coaches to travel on recruiting trips by helicopter or private plane, GT WBB never had access to either of these modes of transportation.

80.     GT's and Defendant GTAA's failure to provide the WBB team a similar travel budget relative to the MBB team denied the WBB team equal athletic opportunity and negatively impacted the terms and conditions of Coach Joseph's employment.  It interfered with Coach Joseph's ability to develop and administer the WBB program, as it often resulted in student-athlete welfare issues, such as fatigue, missed classes, and less time for game preparation, impacted game performance, and led recruits to question the school's commitment to the team's success within the ACC and nationally.

81.    Based on information and belief, Defendants Peterson, Stansbury, and Lewis had the power and authority to allocate financial resources to improve the WBB team's travel budget, but chose not to allocate them to Coach Joseph and the WBB team because of Coach Joseph's sex and/or the sex of the athletes she coached.

## Coach Joseph Vocally Opposed the Defendants' Disparate Treatment of Her and the WBB Team.

82.    Throughout her employment, Coach Joseph regularly raised concerns to supervisors, Athletic Directors, and compliance personnel in the Athletic Department about the Institute's disparate treatment of her and her program relative to its treatment of the head coaches of the MBB team and MBB program, including disparities in facilities, publicity/marking, staffing, recruiting, and travel, and reasonable belief that GT and Defendant GTAA were not treating the WBB team in a similar manner as the MBB team.

## January 2007-January 2013

83.    From 2007 to 2013, Coach Joseph's advocacy for equal treatment for her and her team relative to their male counterparts helped achieve some progress toward gender equity at GT, aided in part by the existence of the "Gender Equity and Minority Plan" (the "Gender Equity Plan").  GT adopted the Gender Equity Plan pursuant to the NCAA's Certification Process, which required Division I

27

schools to complete a comprehensive campus-wide self-study of gender equity issues in their athletic programs every 10 years.  The purpose of the self-study was to assess an institution's compliance in 17 program areas related to gender equity in athletics.  After the self-study, the NCAA required each institution to identify areas of deficiency, develop a five-year written gender equity plan to address the deficiencies, review the plan on an annual basis to assess the institution's compliance, and make updates to the plan as necessary.

84.   By requiring GT to conduct regular comprehensive reviews of its athletic programs and to set measurable standards for achieving gender equity, the Gender Equity Plan better ensured that it provided Coach Joseph the resources and benefits she needed to develop and lead the WBB program and directly address inequities facing her team.

85.   The effectiveness of the Gender Equity Plan in ensuring adequate allocation of resources between Coach Joseph and the head coach of the MBB team was bolstered by strong institutional support from Coach Joseph's then supervisor, Theresa Wenzel.  GT and Defendant GTAA hired Ms. Wenzel in 2005 as a Business Manager, and promoted her to Assistant Athletic Director and Director of Title IX Compliance in May 2006.  At this time, Ms. Wenzel became the highest-ranking female involved with the management of GT's intercollegiate

athletics program, thereby elevating her to GT's Senior Woman Administrator ("SWA").

86.    Ms. Wenzel was an outspoken advocate for gender equity in athletics at GT.  She vigilantly monitored GT's and Defendant GTAA's compliance with its Gender Equity Plan, regularly pushed the Athletic Department to implement policies and practices that ensured equity, and welcomed conversations with female coaches and male coaches of female sports who had gender equity concerns within their program.  Ms. Wenzel's efforts to achieve gender equity in athletics at GT were supported by the then-Athletic Director, Dan Radokovich.

### January 2013-Spetember 2015

87.    Starting in 2013, however, changes in GT's Athletic Department leadership ushered in a changed perspective toward gender equity issues and led to increasing hostility toward Coach Joseph for her advocacy for equal treatment for her and her team.

88.    In January 2013, GT and Defendant GTAA announced the hiring of a new Athletic Director, Mike Bobinski, to take over for Mr. Radokovich, effective April 2013.  Within the first eighteen months of his employment, Mr. Bobinski replaced the majority of the leadership in the Athletic Department, thereby

eliminating leadership which had working knowledge of gender equity issues in GT athletics, including the Gender Equity Plan.

89.     At this point, GT's willingness to work with Coach Joseph to better ensure that it provided her equivalent resources to support and develop her program consistent with its treatment of the head coaches of the MBB team started to erode, as the new Athletic Department leadership adopted a different and decidedly negative perspective on these issues.

90.     From 2013 to 2016, tensions emerged between Mr. Bobinski and his new leadership team (particularly Associate Athletic Director of Finance and Administration Defendant Lewis) on the one hand, and incumbent employees (particularly Coach Joseph and Ms. Wenzel) on the other, regarding budget and Title IX compliance issues.

91.     Prior to 2014, Frank Hardymon, the then-Associate Athletic Director of Finance and Administration, and Ms. Wenzel oversaw finance and Title IX compliance in the Athletic Department.  Under their leadership, GT conducted an annual financial analysis of the dollars spent on the relevant Title IX program area – *e.g.*, facilities, publicity, coaching, etc. – by gender for each sport to ensure GT's compliance with the Gender Equity Plan, hereinafter referred to as the "annual equity financial analysis."

92.     In mid to late 2014, Mr. Bobinski hired Defendant Lewis to replace Mr. Hardymon.  Following that time, Ms. Wenzel informed Defendant Lewis of the annual equity financial analysis she and Mr. Hardymon performed to ensure GT's compliance with the Gender Equity Plan, and emphasized to him that it was an important tool for the Athletic Department.   When Defendant Lewis acknowledged that he had not previously been aware of the annual equity financial analysis, Ms. Wenzel encouraged him to continue performing the analysis as it was a good check and balance of financial spending in athletics.

93.     Without the check of the annual equity financial analysis in place, Coach Joseph worried that Defendant Lewis, who is a former GT MBB player, would make budgeting decisions that favored the MBB team over the WBB team. This concern proved to be true.

94.     Defendant Lewis' bias in favor of the MBB team, together with his resistance to conducting the annual equity financial analysis, negatively affected Coach Joseph and the WBB team.

95.     As Associate Athletic Director of Finance and Administration, Defendant Lewis set the budget for each athletic program, and met with the individual coaches to go over that year's budgetary allotment.

96.    In 2014, when GT was still conducting the annual equity financial analysis, Mr. Hardymon had promised Coach Joseph that GT and/or Defendant GTAA would grant her a modest increase in her 2015-2016 budget for, *inter alia*, staffing, game guarantees, recruitment, and technology updates.  In addition, Mr. Hardymon informed Coach Joseph that she could hire three less expensive (less qualified) assistant coaches for the 2014-2015 season, and the money she saved (approximately $48,000) would be provided to her in the following year's budget, when the ACC was set to expand into a more competitive league, and she would need the money more.

97.    Although Coach Joseph expected Defendant Lewis to honor Mr. Hardymon's prior budget decisions, he did not do so.  In or around April 2015, during her first budget meeting with Defendant Lewis, Defendant Lewis not only asked Coach Joseph to justify her budgetary requests for game guarantees, travel, recruitment, and technology, but he refused to permit her to use the pool of money for assistant coaches salaries that Mr. Hardymon had approved the prior year. Defendant Lewis' refusal to honor Mr. Hardymon's prior budget commitment forced Coach Joseph to eliminate a graduate assistant position, as well as use $20,000 from her fundraising budget, in order to hire better qualified coaches.  Not only did this unnecessarily decrease her fundraising budget, but it also eliminated

the graduate assistant position responsible for WBB laundry and equipment services, which resulted in the team being understaffed.

### The Defendants Retaliated Against Coach Joseph for Her Opposition to GT's Disparate Treatment of Her and the WBB Team, and Continued to Subject Her to Disparate Treatment.

### September 2015-Septeber 2016: The September 2015 Reprimand

98.    Over the next few months, Coach Joseph objected to Defendant Lewis' efforts to decrease her budget and told him she believed he was treating her and the WBB team differently than coaches of the MBB team and the MBB team. Ms. Wenzel also tried to educate Defendant Lewis on the necessity to assess budget decisions in light of the Gender Equity Plan.

99.    Instead of engaging Coach Joseph and Ms. Wenzel on these topics, Defendant Lewis became increasingly frustrated and dismissive of their concerns and refused to change his position on budgetary decisions.  Ms. Wenzel had participated in budget meetings at this time between Defendant Lewis and other coaches, and reported to Coach Joseph that his tone and demeanor toward her when she questioned him was noticeably different and more hostile than towards other coaches.

100.    Around the same time that Coach Joseph and Ms. Wenzel were discussing the WBB budget issues, Ms. Wenzel was separately encouraging Mr.

Bobinski to conduct the annual Gender Equity Plan assessment. She was particularly persistent after the NCAA formally replaced the Certification Process with the Institutional Performance Plan ("IPP") in or around June 2015. While the IPP required GT to collect and maintain data regarding student-athletes' experiences, it did not require it to examine gender equity issues. Because Ms. Wenzel believed that gender equity issues remained a serious problem in the Athletic Department, as evidenced, for instance, by Defendant Lewis' recent budgetary decisions vis-à-vis the WBB team, she thought it was important that GT maintain the Gender Equity Plan alongside of the IPP.

101. Coach Joseph's and Ms. Wenzel's ongoing disagreements with Defendant Lewis over the budget and with Mr. Bobinski over Title IX compliance caused visible tension between them. Outward expressions of frustration, such as Defendant Lewis' demeaning conduct toward Coach Joseph during budget meetings, eventually escalated into retaliatory actions designed to harm the reputations of Coach Joseph and Ms. Wenzel, and set the stage for their departure.

102. On or around September 15, 2015, in an effort to retaliate and create a paper trail, Mr. Bobinski issued Ms. Wenzel and Coach Joseph formal reprimands for alleged excessive alcohol intake and unprofessional conduct at a football game. Mr. Bobinski lacked a factual basis for the reprimands, as multiple witnesses

confirmed that Coach Joseph was not intoxicated or acting inappropriately. Furthermore, the grounds for the reprimands were apparently inconsistent with his treatment of at least one other male employee – GT sports radio personality Brandon Gaudin – who was arrested for driving under the influence of alcohol around the same time, and based on information and belief, did not face a similar reprimand from Mr. Bobinski for this transgression.

103.   Shortly after Mr. Bobinski issued Coach Joseph and Ms. Wenzel the September 15, 2015 reprimand, Mr. Bobinski separately notified Ms. Wenzel that he did not intend to renew her contract for the following year.

104.   After Mr. Bobinski set Ms. Wenzel's termination in motion, he and Defendant Engel, who Mr. Bobinski had hired as Associate Athletic Director of Compliance, took steps to formally excise the Gender Equity Plan from Defendant GTAA's bylaws.   On October 22, 2015, Defendant Engel recommended to Defendant GTAA's Board of Trustees that it amend its bylaws to remove reference to the Gender Equity Plan and eliminate its obligation to annually assess GT's and Defendant GTAA's compliance with it, which the Board subsequently agreed to do.

105.   By voting the Gender Equity Plan out of Defendant GTAA's bylaws, GT and Defendant GTAA were no longer obliged to assess or ensure gender equity

in athletics, including conducting financial analyses of their budgets and assessing what GT and Defendant GTAA spent per student-athlete per sport, as it had done when it annually reviewed the Gender Equity Plan.

106.   The elimination of the Gender Equity Plan and the removal of Ms. Wenzel required Coach Joseph to assume an even greater role in advocating for basic program necessities for her and her team starting in January 2016, after Ms. Wenzel's departure.

107.   From January through August 2016, Coach Joseph raised repeated concerns with Mr. Bobinski and Defendant Lewis about the Institute's failure to provide her adequate and equal resources for elements of her program, such as facilities, staffing, and professional development, and apprised them of her efforts to raise funds through donors to meet the minimal needs related to these program areas.

108.   During this same time period, Coach Joseph also continued to raise concerns with Mr. Bobinski and Defendant Lewis over Defendant Lewis' treatment of the WBB team's budget.

109.   Tensions between Mr. Bobinski, Defendant Lewis, and Coach Joseph over budget issues became particularly acute from March through May 2016, during which time Defendant Lewis and Coach Joseph participated in their second

36

annual budget meetings.  Similar to their prior budget meetings, Defendant Lewis resisted Coach Joseph's request for a modest increase in her budget while Coach Joseph continued to push back on Defendant Lewis' seemingly baseless and discriminatory budget decisions.

110.  Coach Joseph's opposition to Defendant Lewis' discriminatory budgetary decisions appeared to frustrate him, particularly during a series of discussions in which Coach Joseph requested that Defendant Lewis not require her to use fundraising dollars to supplement assistant coach salaries, as he had in the previous year.  Although Mr. Bobinski ultimately authorized a $5,500 increase to Coach Joseph's assistant coaches salary pool, he did so only after she spent days proving the prior approval for the budget increase to Defendant Lewis.

111.  Mr. Bobinski's and Defendant Lewis' treatment of the WBB team's assistant coach salary pool stood in stark contrast to their treatment of the MBB team's assistant coach salary pool, which they increased by 35 percent, or $190,000, that same budget cycle.  In contrast to the great lengths Coach Joseph had to go to in order to obtain the modest increase in her salary pool, a May 17, 2016 article from the Atlanta Journal Constitution ("AJC") quotes Coach Pastner as saying that Mr. Bobinski was the one "who envisioned" the significant increases in the MBB's assistant salary pool.

112.    While Defendant Lewis' hostile treatment of Coach Joseph intensified throughout 2016, leadership changes in the Athletic Department in early August 2016 provided her some hope that she might escape the discrimination, retaliation, and harassment she was then facing.  At this time, GT and Defendant GTAA hired Joeleen Akin as Associate Athletic Director and SWA (effective August 8, 2016), and Paul Griffin as interim Athletic Director (effective August 9, 2016).

113.    Coach Joseph hoped Ms. Akin, the first SWA since Ms. Wenzel, would be as supportive of her efforts to ensure the Institute's equal treatment of her and her team.  Unfortunately, she was not.

114.    Around the same time GT hired Mr. Griffin and Ms. Akin, it elevated Defendant Lewis to the position of MBB Sports Administrator, thereby giving him both control of the Athletic Department budget *and* a vested interest in the success of the MBB team.

115.    The elevation of Defendant Lewis to MBB Sports Administrator aggravated tensions between Defendant Lewis and Coach Joseph.

116.    Presumably viewing the change in leadership as an opportunity to silence Coach Joseph, a member of the Athletic Department around this time allegedly directed Ms. Akin, a new employee with no pre-existing loyalty to Coach

Joseph, to get Coach Joseph – the vocal and persistent advocate for female coaches and her own team – "under control."

117.   Within weeks of receiving this directive, Ms. Akin took steps to do just that.

### September 2016-December 2016: The Ginger Sanford Investigation and Final Written Warning

118.   The first opportunity Ms. Akin had to get Coach Joseph "under control" occurred in August 2016, when Coach Joseph's new Office Manager/Special Assistant, Ginger Sanford (who had been friendly with Defendant Lewis prior to her employment) filed a complaint with Human Resources ("HR") against Coach Joseph.

119.   Coach Joseph had hired Ms. Sanford as Office Manager/Special Assistant in or around June 2016, after her former Office Manager/Special Assistant of eleven years, Karen Sugrue, voluntarily resigned.

120.   In her initial communications with Ms. Sanford, Coach Joseph provided her two separate task lists relating to the two components of the job – Office Manager, which primarily focused on providing support to Coach Joseph in her administration of the WBB team, and Special Assistant – which primarily entailed performing a subset of personal tasks Ms. Sugrue had periodically performed for Coach Joseph.

121.   Fully understanding the dual nature of the Office Manager/Special Assistant position, Ms. Sanford accepted the job, and committed to start on or around June 14, 2016.

122.   Subsequent to her approved training and after attending two additional training sessions conducted by the Georgia Tech Business Office, Ms. Sanford struggled to keep up with her tasks, most significantly budget related tasks.

123.   Desiring to provide Ms. Sanford with additional training and guidance on the budget tasks, Coach Joseph asked a member of Defendant Lewis' staff, Selinda Biggers, to help Ms. Sanford, but Ms. Biggers told Coach Joseph she did not have time.

124.   Having exhausted most of her training resources, Coach Joseph asked former GT employee Ms. Wenzel, who had a pre-existing relationship with Ms. Sanford and who had extensive knowledge regarding the administrative budget processes and procedures that Ms. Sanford had been unable to successfully implement, to meet with Ms. Sanford to see if she could assist with the budget process.   Ms. Wenzel told Coach Joseph she would be happy to meet with Ms. Sanford to do the same.

125.   On August 15, 2016, Coach Joseph texted Ms. Sanford to schedule the meeting between her and Ms. Wenzel.   Given Defendant Lewis' past hostility

toward both Coach Joseph and Ms. Wenzel over budget issues, Coach Joseph told Ms. Sanford that they did not need to mention the meeting to Mr. Lewis.

126.   A few days later, on August 19, 2016, Coach Joseph had her first formal meeting with Ms. Akin, during which Coach Joseph told Ms. Akin that Ms. Sanford was not "working out" and complained that Ms. Sanford did not do her expense reports and budgeting correctly and did not seem to understand Excel.

127.   During the course of their discussion about Ms. Sanford's job performance, Coach Joseph disclosed to Ms. Akin that Ms. Sanford periodically performed personal tasks for Coach Joseph and showed her the "Special Assistant" task list she provided to Ms. Sanford prior to hire.  Ms. Akin did not object to the fact that Ms. Sanford performed personal tasks for Coach Joseph, nor did she ask Coach Joseph to stop having Ms. Sanford perform personal tasks for her.

128.   Ms. Akin's initial reaction to learning that Ms. Sanford was performing a limited sub-set of personal tasks for Coach Joseph was in line with that of her previous supervisors and colleagues in the Athletic Department. Indeed, during Ms. Sugrue's employment, Coach Joseph's supervisor, Ms. Wenzel, as well as former Associate Athletic Director and SWA Mollie Mayfield, who oversaw Human Resources, and former Athletic Directors Paul Griffin and David Braine, were all aware that Coach Joseph utilized Ms. Sugrue to perform certain

personal tasks and had never reprimanded or otherwise disciplined her for this conduct.  To the contrary, it will well-known within the Athletic Department that other coaches and Defendant GTAA employees, including the Head Football Coach, Head Men's Basketball Coach, previous Athletic Directors, and the Senior Associate Athletic Director for Development, frequently asked their administrative assistants to perform certain personal tasks.

129.  Following her August 19, 2016, meeting with Coach Joseph, Ms. Akin informed Ms. Sanford of Coach Joseph's complaints about her performance.

130.  A few days after Ms. Akin informed Ms. Sanford of Coach Joseph's complaint about her performance, Ms. Sanford filed a complaint with the Office of Human Resources, alleging that Coach Joseph had Ms. Sanford do a "substantial amount of personal work" in addition to her WBB work.  In the same complaint, Ms. Sanford also alleged that Coach Joseph had asked Ms. Sanford to meet with Ms. Wenzel, then a former employee, to help train her on the budget process and directed her not to disclose the meeting to Defendant Lewis – who had no supervisory authority over Coach Joseph or Ms. Sanford, or reason to be informed of Ms. Sanford's meeting with Ms. Wenzel.

131.  Ms. Sanford's complaint was a preemptive strike, calculated to protect her job despite her poor performance.

132.   Nevertheless, presumably viewing Ms. Sanford's complaint as the vehicle by which she could get Coach Joseph "under control", Ms. Akin and/or the other Individual Defendants proceeded to aggressively pursue Ms. Sanford's allegations.

133.   Shortly after receiving Ms. Sanford's complaints, GT retained an outside lawyer, Ginger McRae, to investigate the allegations.  GT did not disclose Ms. Sanford's complaint or the allegations against her at this time.

134.   Instead, the first Coach Joseph learned of Ms. Sanford's concerns was on September 9, 2016, when Ms. Akin demanded that Coach Joseph immediately appear – without any notice whatsoever – for an interview with Ms. McRae that day.  Although Coach Joseph told Ms. Akin that she could not meet with Ms. McRae that day because she had a flight soon to meet an important recruit that she could not miss, Ms. Akin insisted that she attend the meeting anyway.

135.   Coach Joseph complied with Ms. Akin's directive, and sat for the interview, during which Ms. McRae proceeded to subject Coach Joseph to three-hours of interrogation about her use of Ms. Sanford to perform some personal tasks.  While being grilled by Ms. McRae on this topic, Coach Joseph made clear to her that she believed that had she been a male head coach, she would not have been questioned about having staff perform personal work for her.

43

136.    After her questioning about Ms. Sanford, Ms. McRae then interrogated Coach Joseph for another hour and a half to two hours about her relationship with Defendant Lewis, the reasons she instructed Ms. Sanford not to inform Defendant Lewis of her meeting with Ms. Wenzel, and allegations that she had tape recorded conversations with Defendant Lewis.

137.    Ms. Akin's insistence that Coach Joseph submit to a lengthy interrogation about these issues, in a way that directly interfered with her job duties as coach and caused her to miss her flight, seemed punitive and discriminatory.

138.    On the evening of the September 9, 2016, after her meeting with Ms. McRae, Coach Joseph sent Ms. Akin an email stating, "I feel a level of harassment, inequity, and unfair treatment.  I am extremely disappointed this was allowed to happen.  I am left [wondering] why this happened in this manner and if it would have been handled in the same manner if I was the football coach or the men's basketball coach?"

139.    Ms. Akin never followed up or met with Coach Joseph about these concerns.

140.    On September 20, 2016, after having only interviewed Coach Joseph, Ms. Sanford, and Ms. Akin, Ms. McRae issue a Confidential Report, (the "September 20 Report"), in which she substantiated Ms. Sanford's complaints.

141.   In her "analysis" of Ms. Sanford's claim that Coach Joseph had asked her to devote a "substantial" portion of time to personal tasks, Ms. McRae concluded that Coach Joseph had "required" Ms. Sanford to perform "an unreasonable amount of personal work, and frequently gave this work priority over the work for WB" (even though there was conflicting testimony on the amount of time Ms. Sanford spent on personal tasks, and even though Ms. McRae had never asked Coach Joseph about her prioritization of the work); that Coach Joseph had failed to disclose the Special Assistant job description in the hiring process, and that it was "more likely than not" that she had done so because "she knew…the job would not be approved" (again, even though Coach Joseph had explained the dual nature of the job to Ms. Sanford during the hiring process and even though Ms. McRae had never questioned Coach Joseph on this topic); and that her actions were inconsistent with "University System of Georgia ("USG") Ethics Policy…paragraph 2" which prohibits the use of "property" for "personal gain or purposes except for incidental personal use of email, telephone,…or incidental Internet use."

142.   In her "analysis" of Ms. Sanford's claim that she had inappropriately directed her to meet with Ms. Wenzel without disclosing the meeting with Defendant Lewis, Ms. McRae concluded that Coach Joseph "should have

45

disclosed" the meeting in "advance" to Ms. Akin and Defendant Lewis for "advance approval" (even though she did not identify any internal or external rule or policy requiring such advance approval) and that her actions were inconsistent with "USG Ethics Policy paragraph 4" requiring employees to "maintain a professional work environment" and "treat fellow employees…with dignity and respect."

143. On or around September 22, 2016, GT announced that it hired Defendant Stansbury as its' new Athletics Director. Mr. Griffin, who was then serving as interim director of athletics, remained at GT through the end of the year to assist Defendant Stansbury with his transition to Athletics Director.

144. After issuing her September 20 findings to GT, but before notifying Coach Joseph of the September 20 Report, Ms. McRae proceeded to interview seven more individuals from October 6 to October 21, 2016, including former Football Head Coach Paul Johnson and MBB Head Coach Josh Pastner (but neither of their administrative assistants), Senior Associate Athletic Director William Thompson and his Development Assistant Holland Harris, and Ms. Wenzel, Ms. Sugrue, and Ms. Mayfield.

145. Several of these interviewees provided information that severely undermined Ms. Sanford's claim, and Ms. McRae's initial finding, that Coach

Joseph's use of Ms. Sanford to periodically perform personal tasks was inconsistent with a rule, policy, or practice within the Athletic Department.

146. Notably, while Ms. McRae issued two "supplements" to the September 20 Report that summarized the testimony of the new witnesses, she never updated or modified the conclusions she had included in the September 20 Report to accurately reflect the substance of the interviews.

147. As the Sanford investigation progressed, Ms. McRae apparently shared information about the investigation with other members of the Athletic Department, including then interim-Athletic Director Mr. Griffin. On November 21, 2016, while in a meeting with Mr. Griffin on an unrelated topic, Mr. Griffin made clear his hostility toward Coach Joseph because of her complaints of disparate treatment regarding the Sanford investigation. After bringing up the investigation, Mr. Griffin aggressively mocked Coach Joseph, stating "poor, pitiful MaChelle" who thinks "everyone is against [her]." Still maintaining the same adversarial tone, Mr. Griffin then accused Coach Joseph of "attacking" the Institute through her complaints of disparate treatment. At this, Coach Joseph reiterated her concern that GT was targeting her with an investigation of conduct that other male coaches and Athletic Department personnel engaged in without consequence. Mr.

Griffin then stated defensively that the investigation would reveal what she had done wrong and ended the conversation.

148.   On November 29, 2016, approximately a week after Mr. Griffin accused Coach Joseph of "attacking" the Institute through her claims of disparate treatment, Ms. Akin notified Coach Joseph that Ms. McRae had concluded her investigation and asked to meet with her to discuss the findings.  At the November 29, meeting, Ms. Akin issued Coach Joseph a two-page "Final Written Warning" (the "Final Warning") which stated in a conclusory fashion without any explanation that Coach Joseph had violated USG Ethics Policy 2 by allegedly using USG "property" (Ms. Sanford) for personal use and violating USG Ethics Policy 4 by failing to treat others (Defendant Lewis) with dignity and respect by advising Ms. Sanford that she did not need to inform Defendant Lewis of her budget meeting with Ms. Wenzel.

149.   After making these broad statements, Ms. Akin, in the third paragraph of the Final Warning, accused Coach Joseph of engaging in other "unethical" conduct completely unrelated to Ms. Sanford's allegations or the issues vetted in Ms. McRae's investigation, and the bulk of which were completely contradicted by the evidence in Ms. McRae's reports.

150.   In the Final Warning, Ms. Akin also criticized Coach Joseph for potential misconduct that had not yet occurred, but which Ms. Akin believed might occur at some point in the future.  For instance:

a.     Ms. Akin stated that she intended to investigate Coach Joseph's recruiting expenses to ensure that personal and professional expenses were properly separated on her recent Spain recruiting trip.  This statement of intent to investigate Coach Joseph had nothing to do with the Sanford investigation, nor was it relevant to any finding in the Final Warning.  Notably, after GT looked into Coach Joseph's recruiting expenses, it concluded that there were no errors in her expense report for her Spain recruiting trip.

b.     Ms. Akin also broadly stated that she had "concerns" that Coach Joseph was not abiding "by all applicable law, rules and regulations, including NCAA and ACC rules, Board of Regents policies and Institute policies" and was not properly overseeing expending operational resources, including timely submitting her budget paperwork.  Not only were these concerns not relevant to Ms. Sanford's complaint, but they were not supported by any facts or documents.

151. After accusing Coach Joseph of this litany of unsupported misconduct, Ms. Akin concluded the Final Warning by referencing the retaliatory September 15, 2015 reprimand, and warned Coach Joseph that "any future

49

violations of Institute or USG policy or process may warrant her separation from the Institute for cause."

152.   The Sanford Investigation and Final Warning were notable for their aggressiveness, lack of evidentiary support, procedural irregularities, and failure to take into account similar practices by male coaches.   GT's, GTAA's, and Ms. Akin's decision to pursue Ms. Sanford's charges with such aggression and to issue the Final Warning on the basis of such thin evidence only reaffirmed Coach Joseph's belief that certain members of the Athletic Department were targeting her for differential treatment based on her sex and/or the sex of the athletes she coached and in retaliation for her opposition to sex discrimination.

153.   The unusually hostile treatment of Coach Joseph and the WBB program during this period was not only apparent to her, but to others on her staff. Several members of Coach Joseph's staff expressed concern to her around this time about the marked increase in compliance inquiries into the WBB team, and told her that it felt like the Athletic Department was targeting her and the WBB program.

154.   In an effort to address GT's discriminatory and retaliatory treatment of her as reflected in the Sanford Investigation and Final Warning, Coach Joseph, through her attorney submitted a detailed refutation of the allegations and

conclusions in the Final Warning (the "Response") to Ms. Akin, Ms. Hendrickson, and Defendant Peterson in or around February 2017.

155.   In the Response, Coach Joseph detailed all of the problems with the investigation and findings that she and her attorney discovered after a careful review of Ms. McRae's reports and discussions with witnesses, including failure to interview key witnesses, lack of documentary support, contradictory statements, and falsification of a document.

156.   Coach Joseph also noted in the Response that Ms. Akin's issuance of the Final Warning for alleged conduct deviated from the Institute's progressive discipline policy, which calls for the issuance of a "Final Written Warning" – defined as a documented formal conversation about a continuing disciplinary or performance problem – only after previous verbal and written disciplinary attempts have failed.  She also pointed out that by reprimanding her in this manner for using Ms. Sanford for personal tasks, the Institute was selectively enforcing its policies since other coaches and staff used their executive assistants to perform personal tasks but did not face similar discipline.  Coach Joseph noted that this type of selective enforcement raised questions about the true reason for the disciplinary action, and suggested that GT – potentially at the direction of Mr. Griffin, with whom Coach Joseph had recently raised concerns about disparate treatment, or

Defendant Lewis, who had demonstrated prior animus toward Coach Joseph – may be retaliating against her.

157.   After setting forth the glaring problems with the Sanford investigation and Final Warning, Coach Joseph ended the Response by requesting that GT rescind the Final Warning.  She noted that, while she desired to resolve the matter amicably, if GT failed to rescind the Final Warning and took further adverse employment action against her, she would be forced to consider whether to seek appropriate judicial relief.

158.   While Coach Joseph waited to hear back from the Institute regarding her Response to the Final Warning, her concerns about the Institute's ability to adequately and effectively address her concerns of disparate treatment of her and the WBB team deepened when she learned that Defendant Lewis and Defendant Engel were in a romantic relationship.  This was of concern to Coach Joseph because Defendant Lewis had been central in denying her the budgetary resources she needed to support and develop her program for reasons she believed to be discriminatory and retaliatory, and the person responsible for investigating and addressing her complaints about Defendant Lewis' discriminatory and retaliatory treatment was Defendant Engel.

159.   Worried about the obvious conflict of interest created by Defendant Lewis' and Defendant Engel's romantic relationship, and the impact it could have, and likely already had, on Coach Joseph and the WBB team, Coach Joseph spoke to Ms. Akin regarding her concerns about the relationship and the conflict of interest it created.   Coach Joseph told Ms. Akin that it was important for her to be able to report concerns about any inequitable treatment, including Defendant Lewis' discriminatory and retaliatory treatment of her and her team, to the Title IX office, but she now felt inhibited from doing so because the individual responsible for receiving such reports was Defendant Lewis' girlfriend.

160.   Coach Joseph's complaint to Ms. Akin raised serious legal and ethical concerns, including a potential violation of USG Ethics Policy 4, which "specifically states that "[r]omantic or sexual relationships between employees and people in positions of authority are strongly discouraged", and Board of Regents Policy 6.8, which states that employees who "acting individually or in concert with others, who clearly obstructs or disrupts…any teaching, research, administrative, disciplinary, public service or other activity at any University System of Georgia (USG) institution is considered by the Board to have committed a gross act of irresponsibility and shall be subject to disciplinary procedures, possibly resulting in academic dismissal or termination of employment." Notwithstanding the fact that

GT thought it appropriate and necessary to retain an outside lawyer to investigate Coach Joseph for far less serious allegations that did not implicate any apparent legal or ethical standards, Ms. Akin did not, to Coach Joseph's knowledge, take any action to investigate or address Coach Joseph's concerns regarding Defendants Lewis' and Engle's romantic relationship and the conflict of interest it created.

### February 2017-March 2018:
### Ongoing Retaliation/Threats of Termination

161.   Coach Joseph's complaints of disparate treatment and discipline in her Response, and her recent complaints to Ms. Akin regarding the conflict of interest created by Defendants Lewis' and Engel's romantic relationship, intensified GT's efforts to sideline Coach Joseph.

162.   Shortly after Coach Joseph submitted her Response, one of her players, Player 1, informed her that GT intended to fire her.  Specifically, Player 1 showed Coach Joseph a Snapchat message in which Kele Eveland, a GT employee who was a friend of Defendant Lewis, said that GT intended to "get rid of" Coach Joseph.

163.   GT's apparent desire to be rid of Coach Joseph also played out in her efforts to renegotiate her employment contract.  Under the Employment Contract, GT and Defendant GTAA had agreed to engage Coach Joseph in a "good faith reconsideration of the terms and conditions of the Employment Contract after the

completion of the 2016-2017 season." At the end of April 2017, after a successful 2016-2017 season, GT and Defendant GTAA made no attempt to engage with Coach Joseph or her agent about extending her contract or her future as Head Coach.

164. Around this same time, GT and Defendant GTAA also flatly denied Coach Joseph's request to rescind the Final Warning, further making it clear that the Institute had no interest in negotiating any part of the terms and conditions of Coach Joseph's employment at GT.

165. While GT's and Defendant GTAA's hostility towards Coach Joseph did not relent, she hoped to have some relief from retaliatory harassment after GT and Defendant GTAA made recently hired Deputy Director of Athletics, Mark Rountree, the new WBB Sports Administrator and her direct supervisor. Hoping a non-incumbent employee may be more open to her gender equity concerns, Coach Joseph informed him of the various issues facing her and the WBB team, including her trouble obtaining adequate budgeting for staff salaries, her ongoing concerns about the state of the WBB locker rooms, GT's and Defendant GTAA's continued lack of support for WBB in publicity and marketing, and the insufficient travel budget. Although Mr. Rountree did not respond with the hostility demonstrated by

Defendant Lewis, Defendant Engel, and Ms. Akin to these concerns, he also did not take proactive steps to address the problems either.

166.   Thus, the discrimination and retaliation Coach Joseph had been facing continued unabated.

167.   Coach Joseph's concerns about GT's and Defendant GTAA's discriminatory and retaliatory treatment of her intensified again in early October 2017.  At this time, Coach Pastner self-reported potential NCAA violations to GT on or around October 2, 2017.  Two days later, on October 4, 2017, GT and Defendant GTAA announced that it had extended Coach Pastner's original contract – under which GT and Defendant GTAA agreed to pay him an average of $1.87 million per year over six years — one year through the 2022-2023 season based on his positive performance that season.  At the same time, GT and Defendant GTAA also promised Coach Pastner a $500,000 retention bonus if he remained the coach through the end of the 2021-2022 season.

168.   Thus, around the same time GT failed to engage Coach Joseph in discussions about extending her contract despite its contractual obligation to do so, it extended Coach Pastner's contract despite him having achieved the same success as Coach Joseph that season – *i.e.*, leading the team to the National Invitation

Tournament ("NIT") – and despite him being implicated in potential NCAA violations.

169. To the contrary, GT and Defendant GTAA immediately and publicly stated its full support for Coach Pastner. Less than a week after news of the NCAA scandal broke, Defendant Peterson told the Atlanta Journal Constitution ("AJC"), "The NCAA's looking into it, and we'll see what happens, but I'm proud to have [Coach Pastner] as our basketball coach." Similarly, shortly after additional serious allegations emerged of a personal nature against Coach Pastner, Defendant Stansbury endorsed him in an interview with the AJC, stating, "I am still bullish on Josh . . . I think he is a great coach and a great person."

170. Even though Coach Joseph had achieved the same level of success as Coach Pastner in the 2017-2018 season and had not engaged in any conduct that violated NCAA rules or regulations, GT and Defendant GTAA continued to rebuff her efforts to engage in any conversations about extending her contract.

171. In or around May 2018, after the 2017-2018 season came to a close, Coach Joseph, through her agent, again initiated contract extension discussions with Mr. Rountree. Even though Coach Joseph had just recently secured a top-10 recruiting class, including two McDonald's All-American players, Mr. Rountree and Defendant Stansbury remained tentative about extending Coach Joseph's

contract.  Mr. Rountree stated that Defendant Stansbury was open to extending Coach Joseph's contract, but with no guarantee, meaning the contract could be terminated at any time without financial penalty.  This type of contract is unheard of in collegiate basketball, and was not a reasonable offer.

172.  In response to Mr. Rountree's unreasonable offer, Coach Joseph, through her agent, requested a two-year contract extension with a salary in the top half of the ACC, and additional years if she made it to the NCAA tournament. Despite Coach Joseph's good faith efforts to negotiate, Mr. Rountree and Defendant Stansbury failed to provide Coach Joseph a substantive response to her counterproposal for several months.

### May 2018-November 2018:
### The NCAA Inquiry and Increased Compliance Scrutiny

173.  GT's and Defendant GTAA's refusal to engage in good faith contract negotiations was not the only unusual obstacle Coach Joseph faced at this time. On or around May 2, 2018, Defendant Engel met with Coach Joseph, Defendant Stansbury, and Mr. Rountree, and informed them that the NCAA had allegedly sent GT a letter asking it to conduct an internal review of the WBB's recruitment of a new player, Player 2.  Although a coach from another school had previously asked Coach Joseph if anyone on her staff had paid to get Player 2, the claim was baseless, had arisen nearly a year prior, had been thoroughly investigated by Coach

Joseph and reported to Mr. Rountree, and Mr. Rountree had stated that he was not concerned about the allegation.

174.   Coach Joseph, through her attorney, asked GT's outside counsel, John Long, for a copy of the NCAA inquiry letter to more fully assess the legitimacy of the source of the inquiry, but Mr. Long refused to respond to Coach Joseph's attorney's repeated requests.

175.   GT's and Defendant GTAA's treatment of Coach Joseph and the WBB program in the immediate aftermath of learning of the Player 2 issue stood in stark contrast to its treatment of Coach Pastner less than a year before, when it learned of potential NCAA violations that occurred either with his knowledge or under his supervision.  Neither Defendant Peterson nor Defendant Stansbury issued public statements of support, as they had done with Coach Pastner earlier in the year.  Nor did Defendants Peterson, Stansbury, or Mr. Rountree ask Coach Joseph whether there was any merit to the allegations.

176.   The combination of the stalled contract negotiations and the new inquiry into a year-old issue made Coach Joseph concerned that the Institutional Defendants and/or the Individual Defendants may be developing a new tactic to "get rid" of her, and prompted Coach Joseph to confide her concerns about retaliation to Mr. Rountree.

177.   In early May 2018, during a telephone call with Mr. Rountree, Coach Joseph reiterated to him that she believed Defendant Lewis and Defendant Engel were targeting her based on her prior complaints related to the Institute's discriminatory treatment of her and her team, particularly with respect to Defendant Lewis' budget decisions.  Coach Joseph referenced, as an example, the Sanford investigation and Final Warning, which she told Mr. Rountree she believed to have been undertaken to harass and retaliate against her.

178.   In response to her concerns, Mr. Rountree disclosed information to Coach Joseph that confirmed her suspicions about the propriety of the Sanford investigation and Final Warning, namely, that Ms. Akin, who ultimately issued the Final Warning to Coach Joseph, had told him that shortly after she began at GT, someone in the Athletic Department told her to get Coach Joseph "under control" and then forced her to issue Coach Joseph the Final Warning.

179.   Although Mr. Rountree did not disclose who pressured Ms. Akin to turn against Coach Joseph, the only people in the Athletic Department who would have had the motive and authority to direct such an investigation would have been Mr. Griffin, the then-interim Athletic Director who had accused her of attacking the Institute through her complaints of disparate treatment; Defendant Lewis, with whom Coach Joseph had clashed over budget issues and who was friendly with

Ms. Sanford; and Defendant Engel, who Coach Joseph learned had been dating Defendant Lewis and oversaw the Compliance Department that she had repeatedly criticized.

180.   Days after Coach Joseph's conversation with Mr. Rountree, Ms. Akin confirmed directly to Coach Joseph that someone in the Athletic Department had directed her to get Coach Joseph "under control" and then, not long after, pressured her to issue the Final Warning. Ms. Akin would not disclose who gave her these directions, but again, Coach Joseph had strong reason to believe it was Mr. Griffin, Defendant Lewis, and/or Defendant Engel.

181.   Despite Defendant Engel's growing hostility toward Coach Joseph, and the ongoing internal investigation into the Player 2 issue, Coach Joseph continued to advocate for equal treatment for her and the WBB team, which only provoked Defendant Lewis and Defendant Engel further.  For instance, on May 31, 2018, Coach Joseph again raised concerns about several discrimination issues during a Staffing Audit she presented on May 31, 2018.  In it, Coach Joseph highlighted the historical inequities that she and her team had faced, including discrimination in publicity and marketing, facilities, staff resources, and team travel.  Coach Joseph noted that the GT WBB budget for marketing, staffing, and travel were all in the bottom half of the ACC, and articulated a litany of concerns

about the WBB facilities.  In response to Coach Joseph's discussion of disparate treatment of her and the WBB team, Defendant Engel sharply questioned why she needed more travel money, while Defendant Lewis challenged her on the accuracy of the budget figures she received from the ACC for other WBB programs.  At multiple points during her presentation, the two of them were snickering for no apparent reason.

182.   Another meeting participant, Phyllis LaBaw, GT's Senior Associate AD for Academics, told Coach Joseph after the meeting that she noticed the hostility towards her from Defendant Lewis and Defendant Engel.  She added that she had not seen them treat any other coach in this manner, and that Coach Joseph's presentation was the best she had seen.

183.   GT's, Ms. Akin's, and Defendants GTAA's, Lewis', and Engel's hostile and disparate treatment not only impacted Coach Joseph, but also her staff. On June 18, 2018, frustrated with the targeted harassment of Coach Joseph and the WBB team and GT's and Defendant GTAA's continued refusal to issue him (and the rest of the WBB staff) a new employment contract, WBB Assistant Head Coach, Rob Norris, quit.  According to Mr. Norris, he felt that he had no choice but to resign in light of GT's unexplained failure to renew WBB staff contracts, presumably pending resolution of the NCAA inquiry.

184.   In his resignation email to Coach Joseph, Mr. Norris noted that while Coach Joseph had "enjoyed more success than almost any other coach at Georgia Tech," he found the environment at GT "very difficult" and noted that throughout his tenure, GT did not give the WBB program the attention it deserved.  Notably, at the conclusion of Mr. Norris' resignation email, he pointed out that during his tenure "it also seemed that Women's basketball was being targeted by various departments."

185.   In late June 2018, less than two months after Defendant Engel had investigated the Player 2 issue internally, GT, presumably at the direction of Defendant Engel, requested that the NCAA open up a formal investigation into the Player 2 issue.

186.   Not understanding how Defendant Engel could have possibly amassed enough evidence in her short investigation to warrant recommending a full NCAA investigation, Coach Joseph expressed concern about Defendant Engel's conduct to Ms. Akin.  Coach Joseph told Ms. Akin that she continued to feel targeted and harassed by Defendant Lewis and Defendant Engel.   Coach Joseph cited the baseless investigations into her conduct as an example of the harassment to which she had been subjected and stated her belief that Defendant Lewis and/or Defendant Engel had precipitated the investigations.  Coach Joseph reiterated again

her concern that, due to her relationship with Defendant Lewis, she did not believe Defendant Engel was taking seriously her concerns about the inadequate support the Institute offered WBB as compared to the men's program because Defendant Engel was reflexively defensive of Defendant Lewis's pro-MBB decisions.

187.   Ms. Akin said she had previously raised the issue of the conflict of interest and impediments to effectively grieving concerns of discriminatory budget decisions as a result of Defendant Lewis' and Defendant Engel's relationship with Defendant Stansbury, but he had responded that the relationship had the blessing of Defendant Peterson and therefore he could not do anything about it.

188.   Over the next month, neither Mr. Rountree nor Ms. Akin took steps to address the concerns Coach Joseph had raised about the conflict of interest created by Defendant Lewis' and Defendant Engel's relationship and the continued discrimination, harassment, and retaliation she faced, which prompted Coach Joseph to convene a formal meeting with Defendant Stansbury and Mr. Rountree to once again implore them for help.

189.   On July 25, 2018, at the meeting with Defendant Stansbury and Mr. Rountree, Coach Joseph reiterated her concern that Defendant Lewis and Defendant Engel ran their departments in a manner that clearly benefited MBB to the detriment of WBB, and that she felt like she had no one with whom to raise her

concerns about this disparate treatment in light of their romantic relationship. Coach Joseph also noted that other coaches of female sports felt like Defendant Lewis' preference for MBB also inappropriately and negatively impacted the financial resources he allocated to their respective teams, and that they also felt unable to address the discrimination since his girlfriend oversaw Title IX compliance.  On this point, Coach Joseph specifically noted that the volleyball coach was upset that she did not have enough lockers for her team, and she felt that she had no one to report her concerns to.

190.  Defendant Stansbury reacted strongly, snapping at Coach Joseph, "Maybe they [the female coaches] all need to be fired!" or words to that effect.  He explained that he had been there for a year and a half, and if the female coaches could not get on board with the way the Athletic Department was run, maybe they needed to be gone.  Defendant Stansbury then pivoted and said that Defendant Peterson had approved Defendant Lewis' and Defendant Engel's relationship.

191.  Over the next month, Coach Joseph continued to raise concerns about Defendant Lewis and Defendant Engel, and their discriminatory and retaliatory treatment of her and the WBB team, with various members of the Athletic Department.

192.  For instance, on August 9, 2018, Coach Joseph emailed Defendant Stansbury and Mr. Rountree, copying Ms. Akin, with her evaluations of the staff in the GT Athletics Department.  In her evaluation, Coach Joseph raised concerns about several issues, including about Defendant Engel and Defendant Lewis, and sex discrimination.   Coach Joseph stated that Defendant Engel did not have relationships in the Athletic Department except with Defendant Lewis, and their relationship created a conflict of interest.  Coach Joseph explained that because Defendant Lewis oversees budgeting for GT WBB, and Defendant Engel is responsible for Title IX compliance, it was uncomfortable to discuss issues of gender equity without feeling that they were "on the same page" and exuding a "feeling of defensiveness."   Coach Joseph added that Defendant Lewis was generally not supportive of sports other than GT MBB.

193.  Coach Joseph's persistent complaints intensified the Defendants retaliation against her.   A few weeks after her July 25, 2019, meeting with Defendant Stansbury and Mr. Rountree, Coach Joseph through her agent followed up with Defendant Stansbury about her contract extension, which Defendant Stansbury had yet to commit to extending.  Defendant Stansbury continued to delay committing to extending Coach Joseph's employment contract, this time claiming that GT would not allow him to extend Coach Joseph's contract while the

NCAA investigation into her program was underway.    Defendant Stansbury claimed, however, that if the NCAA cleared Coach Joseph and her program of wrongdoing, he expected the process to move forward.

194.    Around this same time, Defendant Engle's retaliatory harassment of Coach Joseph also intensified.  In or around August 2018, for instance, Defendant Engel interrogated and threatened one of Coach Joseph's players, Player 3, who allowed her former high school basketball team to tour the McCamish gym and shoot baskets after they attended an Atlanta Dream game at McCamish.  Defendant Engel claimed that Player 3's conduct likely violated a NCAA rule or regulation, and told Player 3 that someone would be charged with a NCAA violation.  After this unprofessional exchange, Defendant Engel then tried to blame the violation on Coach Joseph, even though she was in Europe recruiting when this event occurred and had no knowledge of it until after the fact.  Defendant Engel's treatment of Player 3 and Coach Joseph stood in stark contrast to her treatment of the MBB team and Coach Pastner, who regularly allowed high school players and members of summer club teams to use its facilities for practice and other purposes without scrutiny.

195.    Having tried to appeal to Defendant Stansbury, Mr. Rountree and Ms. Akin to counsel Defendant Engel on her disparate treatment of Coach Joseph and

the WBB team to no avail, Coach Joseph decided to address the disparate disciplinary issue with Defendant Engel directly.

196.  On September 6, 2018, Coach Joseph emailed Defendant Engel, copying Defendant Stansbury, Mr. Rountree, and Ms. Akin regarding her concerns about Defendant Engel's treatment of the WBB team.  Coach Joseph stated that "there appears to be a double standard and inequity between the men's and women's basketball programs," and noted that the MBB routinely allowed the high school players and summer club teams to use its facilities for practice and other purposes yet Defendant Engel, to her knowledge, never investigated Coach Pastner for that conduct.  Coach Joseph then noted, "Candidly, I am not sure how to properly raise these concerns as you have oversight of gender equity and Title IX issues, which seems in this instance to be a conflict of interest."  Coach Joseph concluded by noting that she felt "compelled to address any apparent inequity or Title IX violation with appropriate Georgia Tech Athletic Association administrators."

197.  Despite being put on explicit notice again that Coach Joseph believed that Defendant Lewis' and Defendant Engel's romantic relationship obstructed her ability to grieve legitimate concerns of sex discrimination, neither Defendant Stansbury, Mr. Rountree, nor Defendant Engel took any action to investigate or

address Coach Joseph's concerns.  Instead, Defendant Engel simply stated that if she had Title IX concerns, she could direct them to Burns Newsome, GT's Executive Director of Compliance Programs.  Thereafter, the discrimination, retaliation, and harassment of Coach Joseph continued.

198.  In late October 2018, for instance, during her first interview with the NCAA regarding the Player 2 issue, it became clear that Defendant Engel had falsely described Coach Joseph to the NCAA and GT outside counsel as an obstructionist who did not respect authority.  In particular, during the interview, GT's outside counsel asked Coach Joseph whether she had an "adversarial" relationship with the administration.  As Coach Joseph's relationship with the administration had nothing to do with the Player 2 inquiry, it seemed clear to her that someone, presumably Defendant Engel and/or Defendant Lewis, had injected this idea into the conversation as a way to undermine her credibility.

199.  Nevertheless, Coach Joseph honestly answered the question, stating that she did not think she did and that she enjoyed a good relationship with Mr. Rountree and Defendant Stansbury.  Coach Joseph added that if the investigator was specifically referring to Defendant Engel and Defendant Lewis, she believed Defendant Lewis favored MBB and that his relationship with Defendant Engel had created a conflict of interest that interfered with her ability to do her job.  Coach

Joseph then noted that she believed there was a gender equity problem in GT athletics, and that she had no way to meaningfully address her concerns given that one of the primary drivers of the inequity (Defendant Lewis) was in a romantic relationship with the Director of Compliance (Defendant Engel), who oversaw Title IX compliance in the Athletic Department.

200.   After this interview, Coach Joseph's concern that the Institutional Defendants and/or Individual Defendants were planning to use the NCAA inquiry as justification to end her employment deepened.

201.   Accordingly, to address her growing concerns of discrimination and retaliation, Coach Joseph, through her attorney, sent Defendant Peterson a letter on November 21, 2018, (the "November 21 Letter") notifying him of Coach Joseph's ongoing concerns of sex discrimination and retaliation in violation of, inter alia, Title VII of the Civil Rights Act of 1964 and Title IX of the Education Amendments of 1972.  The letter indicated that GT's discriminatory and retaliatory conduct had resulted in unusual and unreasonable delays in discussions about extending Coach Joseph's employment contract.  The letter also noted that Coach Joseph remained loyal to GT, and invited a discussion to address the problem collaboratively.

202.   Neither Defendant Peterson nor anyone else from GT or Defendant GTAA responded to the letter.

**December 2018-March 2019:**
**Stalled Contract Negotiations, NCAA Clearance, Suspension, and**
**Termination**

203.   Instead of working with Coach Joseph to address the concerns outlined in the November 21 Letter, the Institutional Defendants and Individual Defendants thereafter undertook a course of conduct that was obviously intended to isolate Coach Joseph and ultimately end her employment.

204.   Less than a month after the November 21 Letter, Mr. Rountree who had previously been supportive of Coach Joseph, became increasingly distant and cold.  During a meeting with her on December 12, 2018, Mr. Rountree dismissed her attempt to confide in him her ongoing concerns about Defendant Lewis, Defendant Engel, and gender equity, stating, among other things, that GT did not have any gender equity issues, and even if it did, no one would "die."  Thereafter, Mr. Rountree again refused to engage Coach Joseph in a conversation about extending her contract, and stated instead that the Institute would consider renewing her contract if the NCAA cleared her of wrongdoing and she led the WBB team to the NCAA tournament.

205.   At the same time, a long-time subordinate employee of Coach Joseph's, WBB Player Personal Administrator Felicia Tucker, became unusually combative and insubordinate, most notably on January 24, 2019, during a regularly scheduled staff meeting to discuss routine administrative matters.  Shortly after the meeting started, Ms. Tucker and another staff member and friend of Ms. Tucker, Assistant Director of Operations Brittini Oliver, started to roll their eyes and whisper to each other as Assistant Head Coach Mark Simons was speaking.  In an effort to maintain a level of respect in the meeting, Coach Joseph asked Ms. Tucker and Ms. Oliver to stop acting in a disrespectful manner.  Subsequently, Coach Joseph took over the meeting and followed up on Mr. Simons' prior message about the importance of the staff staying on top of administrative matters to ensure that the team operates smoothly.  In the context of this discussion, Coach Joseph expressed specific concern about Ms. Tucker's recent oversight of two administrative matters, including failing to notify her of the team's recent practice time conflict.

206.   Although Coach Joseph made the statements in a professional and constructive manner, Ms. Tucker immediately became defensive and started to raise her voice.  After a couple of minutes, Ms. Tucker abruptly left the room.  Even though Coach Joseph had only told Ms. Oliver to correct her body

language while Mr. Simons was speaking, she then stated to the room "this is ridiculous, I'm going to HR" or words to that effect and left the room.

207.   Staff members who witnessed Ms. Tucker's and Ms. Oliver's behavior described their reaction to Coach Joseph as unusual and overblown.

208.   After a series of communications with Human Resources about Ms. Tucker's and Ms. Oliver's conduct on January 24, Human Resources Business Partner Kevin Cruse convened a meeting with Coach Joseph, her staff, and Mr. Rountree on February 1, 2019 to resolve matters.  Early into the meeting, Coach Joseph tried to engage Ms. Tucker in a constructive conversation about her concerns and asked why she had not disclosed her apparent frustration with Coach Joseph sooner.  In response, Ms. Tucker revealed that she had apparently gone to Mr. Rountree for a "vent session" about Coach Joseph earlier in the year. In response, Coach Joseph tried to discuss with Ms. Tucker the reasons for the "vent session".  Instead of engaging Coach Joseph in a productive and professional manner, Ms. Tucker lashed out at Coach Joseph, erratically snapping in a raised tone that it was none of Coach Joseph's "business" who she talked to, throwing her notebook down on the desk, and flatly refusing to engage in a constructive dialogue about her concerns.

209.   Staff who were present at the meeting have described Ms. Tucker's behavior as "disrespectful", "rude", "insubordinate", and "troubling."

210.   Even though Mr. Rountree witnessed Ms. Tucker's outward display of hostility and disrespect toward Coach Joseph, he remained inexplicitly silent and ended the meeting without attempting to resolve the conflict.   Mr. Rountree's failure to support Coach Joseph concerned her, and also other staff members present at the meeting, most of whom submitted statements to Human Resources, explaining concern about Tucker's conduct and Mr. Rountree's silence in the face of her behavior.

211.   Even though several employees reported to HR and top leaders in the Athletic Department conduct by Ms. Tucker and Mr. Rountree that clearly violated USG Ethics Policy 4 – requiring employees to "treat fellow employees…with dignity and respect" and "maintain a professional work environment" – Human Resources nor anyone in the Athletic Department retained outside counsel to investigate these employee complaints, as it had done in response to Ms. Sanford's complaints against Coach Joseph, or otherwise discipline Ms. Tucker and Mr. Rountree.

212.   On February 3, 2019, Coach Joseph followed up with Mr. Cruse and Mr. Rountree by email to address the February 1 meeting in a respectful and

professional manner.  She told them that the February 1 meeting left her and her staff in a "very unsettled and unhealthy situation," and emphasized that she believed the way the meeting was facilitated, and the fact that Mr. Rountree provided no support for her, completely undermined her leadership.  Coach Joseph made clear that she believed Ms. Tucker's behavior was completely unacceptable and had created a hostile work environment for her staff, and noted that Ms. Tucker's inability to handle a perceived conflict in a mature, professional manner with clear communication to her direct supervisor should not be accepted or supported.  Coach Joseph also noted that even after the meeting, she still had no clarity or insight into what the original issue was, other than Ms. Tucker felt that she had criticized her performance.

213.  On February 5, 2019, Mr. Cruse told Coach Joseph that he was looking into her concerns and planned to discuss the matter with Defendant Stansbury the following day.

214.  On February 7, 2019, one day after Mr. Cruse spoke to Defendant Stansbury about her concerns, Defendant Stansbury downgraded Coach Joseph's reporting line from Mr. Rountree to Ms. Akin – the architect of the Sanford investigation and Final Warning.

215.  On February 8, 2019, in an effort to escalate her concerns of the ongoing discriminatory and retaliatory treatment she faced, Coach Joseph submitted a formal internal complaint (the "February 8 Complaint") outlining her concerns of discrimination, retaliation, and conflict of interest to Defendant Stansbury, Mr. Rountree, Ms. Akin, Executive Director of Compliance Burns Newsome, and Interim Vice President for Ethics, Compliance and Risk Management Aisha Oliver-Staley.  In her complaint, Coach Joseph set forth the ongoing retaliation she had suffered for opposing the discriminatory practices of several members of the Athletic Department, including Defendant Stansbury, Mr. Rountree, Ms. Akin, Defendant Lewis, and Defendant Engel, and her ongoing concerns about the conflict of interest created by Defendant Lewis' and Defendant Engel's romantic relationship.

216.  Coach Joseph's February 8 Complaint intensified instead of abated the Defendants retaliatory animus.

217.  On or around February 8, 2019, the NCAA notified GT that it had cleared Coach Joseph and her team of all Level I and Level II violations in connection with its investigation into Player 2.  Even though Defendant Stansbury had previously stated to Coach Joseph's agent that GT would renew her contract

when the NCAA cleared her and her team of all potential wrongdoing, that did not occur.

218.   Instead, presumably realizing that it could no longer postpone contract renewal discussions with Coach Joseph, GT made the unusual and unprecedented decision not to inform Coach Joseph, her agent, or her lawyers of the NCAA's decision and instead started to search for other reasons to justify taking more permanent employment actions against her.

219.   On February 12, 2019, two business days after Coach Joseph submitted her internal complaint, Ms. Tucker informed her that the Compliance Office (headed by Defendant Engel) had selected two of her best players for drug testing. Although GT's policy is to randomly select players for drug testing via an automated program, the chances that the automated system would have picked two players from the same team, let alone the two best players on the same team, is incredibly low to nearly impossible.  When Coach Joseph asked Ms. Akin about the reason these players had been selected, Ms. Akin claimed it was because they had not been drug tested when they arrived and were under the age of 18. However, both had turned 18 five months earlier, so Ms. Akin's reason did not make sense.

220.   On February 19, 2019, Coach Joseph met with Mr. Cruse and told him that she believed Ms. Akin's replacement of Mr. Rountree as the WBB Sports Administrator was retaliatory.  Mr. Cruse did not deny this possibility, but instead asked "Did Mark [Rountree] not tell you why he is not working with you?"  After Coach Joseph told Mr. Cruse that Defendant Stansbury had claimed it was because Mr. Rountree needed to focus on the locker room project, Mr. Cruse asked, "Coach why do they all think you are going to sue them?"

221.   Three days later, on February 22, 2019, Ms. Akin notified Coach Joseph that her sophomore players could no longer live in off-campus housing, even though Mr. Rountree had previously supported the idea of these players living off campus in the 2019-2020 season, consistent with the Athletic Department's treatment of sophomore players on male athletic teams.  Given that Ms. Akin's decision on this issue was contrary to Mr. Rountree's statements on the issue, and the Institute's treatment of male sports teams, Coach Joseph asked Ms. Akin for the basis of her decision.  Ms. Akin replied that she, Defendant Stansbury, and Mr. Rountree had met earlier in the week and decided that her sophomores could not move off campus.  Coach Joseph told Ms. Akin that the decision did not make sense and lacked a legitimate basis, pointing out that GT permitted sophomore athletes on male teams to live off-campus.  Coach Joseph then pointedly told Ms.

Akin that her decision was both discriminatory and retaliatory, which Ms. Akin did not admit or deny.  Instead, Ms. Akin declined to engage Coach Joseph and simply stated "I hear you" or words to that effect.

222.   Believing that GT's and Defendant GTAA's decision regarding her team's housing to be discriminatory and retaliatory, Coach Joseph immediately called Coach Pastner to inquire how it treated his players in this area.  When she told Coach Pastner GT's and Defendant GTAA's decision not to allow her sophomore players to live off-campus, he expressed surprise.  Coach Pastner stated that Defendant Lewis had not only come to him the week before and asked if his players (sophomores included) wanted to move off-campus, but had also stated that GT and/or Defendant GTAA was contemplating buying a building off-campus for the football and MBB players to live (sophomores included).  Later that afternoon, Coach Pastner reported back to Coach Joseph that he had asked Defendant Lewis whether the school had a policy prohibiting sophomore athletes from living off-campus, and Defendant Lewis replied that it did not and explained that each sport gets to choose what they want to do with housing.

223.   On February 22, 2019, Coach Joseph, through her attorney, sent another letter to Defendant Peterson, copying Defendant Stansbury, Mr. Rountree, Ms. Akin, and Ms. Oliver-Staley, about GT's housing decision.  In it, Coach

Joseph, through her attorney, told Defendant Peterson that she believed GT's recent housing decision was driven by discriminatory and/or retaliatory motives, noting that Defendant Stansbury, Mr. Rountree, and Ms. Akin made this seemingly baseless decision just two weeks after she submitted the February 8 Complaint. She emphasized that the decision needlessly harmed the student-athletes on the Women's Basketball team and implored him to reverse it before the housing deadline passed.  Even though Ms. Akin subsequently reversed her position, and told Coach Joseph that her sophomores could move off campus if they secured leases by March 3, 2019, efforts to target Coach Joseph continued.

224.   Realizing Coach Joseph would not relent in her complaints of discrimination and retaliation, the Defendants shifted the focus of their efforts to sideline her by seizing on statements from two discontent players – Player 4 and Player 5 – both of whom Ms. Tucker personally mentored on the WBB team in the 2018-2019 season.

225.   Based on information and belief, Players 4 and 5 expressed frustration about Coach Joseph to Ms. Tucker and/or one or more of the Defendants and/or Individual Defendants regarding Coach Joseph, who, once equipped with information regarding player discontent, proceeded to direct an expansive inquiry

into Coach Joseph and her program to finally identify a basis to terminate her employment.

226.   On or around February 25, 2019, without notifying Coach Joseph, GT retained an attorney from an outside law firm (the "Investigator") to investigate unspecified complaints of alleged "player and staff mistreatment."

227.   On February 27, 2019, when the WBB team had two games left in the season and was one win away from making the NCAA tournament, Defendant Stansbury suspended Coach Joseph with pay pending an investigation into an undisclosed personnel matter.  Defendant Stansbury did not provide Coach Joseph any specifics about the "personnel matter" that had warranted such harsh action, nor did he disclose that GT had retained the Investigator to investigate the "personnel matter."  Instead, Defendant Stansbury simply told Coach Joseph not to contact any of her players and then directed her to leave campus and not return unless specifically requested to do so.

228.   Hours later, GT publicly announced Coach Joseph's suspension on Twitter, stating that it had placed her on leave pending an investigation into an unspecified personnel matter.   Prior to starting its investigation into these alleged complaints, the Investigator met with Ms. Akin and Mr. Cruse to obtain

"background information" regarding the Athletic Department and the WBB program.

229.   Thereafter, GT, through the Investigator, conducted an expansive inquiry into Coach Joseph and the WBB team that probed into broad, subjective areas of Coach Joseph's behaviors and program, and extended well beyond an inquiry into complaints of "player and staff mistreatment."   In particular, the Investigator's probe included inquiry into her "relationships" with her players; the well-being of her players; whether she ever physically abused her players; whether she ever mentally or verbally abused her players; whether she ever manipulated or ostracized her players; whether she ever exhibited favoritism toward any of her players; whether she ever intimidated, threatened, or retaliated against she players; whether a consultant psychiatrist on her team ever disclosed confidential information to her; whether she allowed donors to be too involved with the team; whether she ever violated a GT rule or other NCAA policy or procedure; and whether she ever mistreated her staff.

230.   During the pendency of the investigation, the Institutional Defendants and Individual Defendants attempted to restrict the flow of information between the WBB coaches and staff, the majority of whom had no complaints about Coach Joseph's coaching or leadership, and the WBB players.   To achieve this end,

Defendant Stansbury and Ms. Akin prohibited the WBB coaches and staff from speaking to anyone about the investigation, including meeting individually with any of the players.  The Defendants' desire to create a wall between the WBB coaches and staff and the WBB players was so intense in fact that on March 1, 2019, Ms. Akin abruptly terminated a former GT WBB player and Graduate Assistant Coach Antonia Peresson – who had demonstrated great loyalty to GT, the WBB program, and Coach Joseph – for "insubordination" – *i.e.* speaking with a player during the investigation while no was present.

231.   Based on information and belief, at the same time the Defendants were restricting the WBB coaches and staff access to the players, they permitted, and potentially required, the WBB players, who are young and impressionable, to employ a tactic designed to ensure conformity of testimony:  namely, to record the testimony they provided in their interviews with the Investigator in a shared document maintained by a select group of players.  The Defendants also prohibited the WBB players from speaking to their parents about the investigation.

232.   On March 15, 2019, while Coach Joseph was still out on suspension, the NCAA announced that it had found Level 1 – the most serious category of rule breaking – recruiting violations in the MBB program, including evidence that a former assistant coach of Coach Pastner had provided a recruit money for use at a

visit to a strip club, provided false or misleading information to the NCAA about the strip club visit, and attempted to influence a team member to provide the NCAA false information about the visit; as well as evidence that a former friend of Coach Pastner's who the NCAA identified as a "representative of the institution's athletic interests" had provided over $2,000 in impermissible benefits to MBB recruits. GT took no action against Coach Pastner for the widespread misconduct in his program.

233. On March 15, 2019, after learning of the NCAA charges against the MBB team, Coach Joseph, through her attorney, released a public statement regarding the disparate treatment of Coach Joseph relative to Coach Pastner. It said:

"The NCAA has investigated and found multiple high-level recruiting violations by the men's basketball coaching staff, yet it is the women's basketball head coach, MaChelle Joseph, who remains suspended for reasons that have yet to be disclosed to her or to the Georgia Tech community. The hypocrisy is stunning. Georgia Tech's actions with respect to Coach Joseph are emblematic of the persistent double standard for men and women across collegiate athletics."

234. On March 20, 2019, in a radio interview with the Fan, Defendant Stansbury announced his public support for Coach Pastner, notwithstanding the

Level I NCAA violations recently levied against the MBB program, stating that the NCAA investigation "in no way affects Josh. We're just looking forward to getting through this process and being able to move on from it." Defendant Stansbury did not at this time, or at any time, publicly announce that the NCAA had recently cleared Coach Joseph and her program of all Level I and Level II violations.

235. That same day, March 20, Defendant Stansbury notified Coach Joseph that the Investigator had completed his investigation and emailed her a copy of his 16-page Confidential Report (the "March 20 Report") detailing his findings of his investigation into the complaints of "player and staff mistreatment." The March 20 Report still did not identify or specify the complaints that prompted the investigation, nor did it identify the players or staff members who made the statements contained in the report. Instead, it broadly discussed statements from players and staff relating to ten areas of inquiry: (1) the relationship between Coach Joseph and her players; (2) Coach Joseph's players' feelings associated with being part of the program; (3) player well-being; (4) physical mistreatment; (5) emotional or mental mistreatment; (6) favoritism or unequal treatment; (7) intimidation, threats, and/or retaliation; (8) the involvement of a psychologist and

donors in my program; (9) violations of NCAA rules and/or regulations; and (10) staff mistreatment.

236.   After a vague discussion of these broad topics that recited facts that were either false or taken entirely out of context, the Investigator concluded that Coach Joseph treated her players in an abusive manner that went beyond the scope of acceptable coaching.  The Investigator reached this conclusion despite the fact that Coach Joseph's assistant coaches and third party coaching consultants with decades of experience in collegiate athletics stated the opposite.

237.   Relying on alleged statements by unnamed and an unidentified number of players and staff over these professional opinions, the Investigator then concluded that it was more likely than not that Coach Joseph violated USG Ethics Policy 4 – requiring her to "treat fellow employees, students and the public with dignity and respect" – the same policy it invoked in reprimanding her in the Final Warning.

238.   Defendant Stansbury provided Coach Joseph only two business days, until Monday March 25, 2019, to respond to the allegations in the Report, and asked her to meet with him to discuss "next steps" on Tuesday March 26, 2019 at 12:00 p.m.

239.  On March 25, 2019, at approximately 4:45 p.m., Coach Joseph submitted a detailed response to the March 20 Report to the Institute that rebutted the factual allegations of abuse, included statements from former players who undermined the allegation that Coach Joseph was abusive, and made clear that she believed the investigation was driven by discriminatory and retaliatory motives. She also stated that the conclusions in the March 20 Report were sexist and demonstrated a clear double standard for the treatment of female coaches – who are reprimanded for being aggressive and demanding – and male coaches – who are not punished for the same or similar conduct.

240.  On March 26, 2019, at approximately 12:00 p.m., without ever having fully vetting or responding to Coach Joseph's February 8 Complaint alleging discrimination, retaliation and conflict of interest, Defendant Stansbury terminated Coach Joseph's employment, effective immediately.

241.  GT and Defendant GTAA did not have good cause to terminate Coach Joseph's Employment Contract.

242.  On March 26, 2019, after GT fired Coach Joseph, it provided a copy of the inflammatory March 20 Report to at least one press outlet.  After that time, the March 20 Report and false rumors that Coach Joseph had abused her players

circulated throughout the news, subjecting her to public humiliation and disapproval.

243. On March 27, 2019, Defendant Stansbury announced that GT had initiated a review of statements (that GT had affirmatively elicited from current WBB players during the February 25 Investigation) which, if true, could constitute possible violations of NCAA rules or regulations. GT has no legitimate grounds to investigate Coach Joseph or the WBB for NCAA violations, and has only undertaken this investigation to further harm Coach Joseph's professional reputation and retaliate against her.

244. On April 1, 2019, Coach Joseph timely appealed the termination of her employment (the "Appeal") to Defendant Peterson. In her appeal, Coach Joseph made clear that she believed the Institute's decision to terminate her employment was discriminatory and retaliatory. She then requested that the Institute reverse its decision and reinstate her to the position of Head Coach of the WBB team.

245. On April 9, 2019, without fully adjudicating the issues raised in Coach Joseph's Appeal, GT announced that it hired Nell Fortner to replace Coach Joseph as Head Coach of the GT WBB team.

246.   On July 19, 2019, news articles reported that NCAA tapes showed that Coach Pastner mislead NCAA investigators during its 2018/2019 probe into the GT MBB program.  Despite the fact that his misconduct raises serious ethical and legal concerns, including potential violations of the USG Ethics Rule 4 – requiring him to "treat fellow employees, students and the public with dignity and respect" – Coach Pastner remains the Head Coach of the MBB team.

247.   As result of the Defendants' actions, Coach Joseph has suffered and will continue to suffer considerable economic, emotional, and professional harm.

## CAUSES OF ACTION

## COUNT ONE:

**Sex Discrimination on the Basis of Coach Joseph's Sex in Violation of the Education Amendments Act of 1972 (Title IX), 20 U.S.C. §§ 1681, *et seq.* Against Defendants GTAA and Board of Regents.**

248.   Paragraphs 1 through 247 above are hereby incorporated as though each of the factual allegations was restated.

249.   Title IX and its implementing regulations prohibit a recipient of federal funding from discriminating against an employee in education-related employment on the basis of sex, including in rates of pay or any other form of compensation and changes in compensation, job assignments, fringe benefits available by virtue of employment, employer-sponsored activities, including those

89

that are social and recreational, termination, and any other term, condition, or privilege of employment.  34 C.F.R. §106.51 (Nov. 13, 2000).

250.   At all times relevant to this Complaint, Defendants GTAA and Board of Regents were an employer and a recipient of federal funding within the meaning of Title IX and its implementing regulations.

251.   At all times relevant to this Complaint, Coach Joseph was an education-related employee of a recipient of federal funding within the meaning of Title IX and its implementing regulations.

252.   Defendants GTAA and Board of Regents discriminated against Coach Joseph because of her sex (female) by subjecting her to disproportionate funding for the women's basketball team (facilities, marketing, assistant coaches, recruitment funds, and travel) in a manner that adversely affected the terms and conditions of her employment, paying her less than similarly situated male coaches, subjecting her to disparate treatment and disparate discipline, and terminating her employment because of sex.  Defendants GTAA's and Board of Regents' actions constitute discrimination in violation of Title IX and its implementing regulations.

253.   Defendants GTAA's and Board of Regents' actions described above have directly and proximately caused, and continue to cause, Coach Joseph to

suffer loss of income and other financial benefits, a loss of future professional opportunities and future income, pain and suffering, humiliation, personal embarrassment, and damage to her professional reputation.

## COUNT TWO:

### Sex Discrimination on the Basis of the Sex of Coach Joseph and the Student-Athletes With Whom Coach Joseph Worked in Violation of the Education Amendments of 1972 (Title IX), 20 U.S.C. §§ 1681, *et seq.* Against Defendants GTAA and Board of Regents.

254.   Paragraphs 1 through 247 above are hereby incorporated as though each of the factual allegations was restated.

255.   Title IX and its implementing regulations prohibit a recipient of federal funding from discriminating against an employee in education-related employment on the basis of sex, including in rates of pay or any other form of compensation and changes in compensation, job assignments, fringe benefits available by virtue of employment, employer-sponsored activities, including those that are social and recreational, termination, and any other term, condition, or privilege of employment.  34 C.F.R. §106.51 (Nov. 13, 2000).

256.   At all times relevant to this Complaint, Defendants GTAA and Board of Regents were an employer and a recipient of federal funding within the meaning of Title IX and its implementing regulations.

257.  At all times relevant to this Complaint, Coach Joseph was an education-related employee of a recipient of federal funding within the meaning of Title IX and its implementing regulations who worked exclusively with the women's basketball team.

258.  Defendants GTAA and Board of Regents discriminated against Coach Joseph because of her sex (female) and the sex (female) of the student-athletes with whom Plaintiff worked, by subjecting her to disproportionate funding for the women's basketball team (facilities, marketing, assistant coaches, recruitment funds, and travel) in a manner that adversely affected the terms and conditions of her employment, paying her less than similarly situated male coaches, subjecting her to disparate treatment and disparate discipline, and terminating her employment because of sex.  Defendants GTAA's and Board of Regents' actions constitute discrimination in violation of Title IX and its implementing regulations.

259.  Defendants GTAA's and Board of Regents' actions described above has directly and proximately caused, and continue to cause, Coach Joseph to suffer loss of income and other financial benefits, a loss of future professional opportunities and future income, pain and suffering, humiliation, personal embarrassment, and damage to her professional reputation.

## COUNT THREE:

## Violation of Constitutional and Civil Rights Pursuant to 42 U.S.C. § 1983 and the Equal Protection Clause Against Defendants Peterson, Stansbury, Lewis and Engel, in their individual capacities.

260.  Coach Joseph incorporates 1 through 247 above are hereby incorporated as though each of the factual allegations was restated.

261.  Under the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution, employees of public institutions have the right to be free from unlawful employment discrimination on the basis of their sex. This constitutional right is clearly established.  *Cross v. State of Ala., State Dep't of Mental Health & Mental Retardation*, 49 F.3d 1490, 1507 (11th Cir. 1995) (citing *Davis v. Passman*, 442 U.S. 228, 235 (1979)).

262.  Pursuant to 42 U.S.C. § 1983, persons who, acting under the color of state law, violate an individual's constitutional rights can be held liable for damages in their individual capacity.

263.  At all times relevant to this Complaint, Coach Joseph was an employee of a public institution, GT.

264.  Defendants Stansbury, Lewis, and Engel, acting under the color of state law, violated Coach Joseph's constitutional right to be free from sex discrimination in employment, by directly participating in Defendants GTAA's

93

and Board of Regents' discriminatory actions to subject Coach Joseph to disproportionate funding for the women's basketball team (facilities, marketing, assistant coaches, recruitment funds, and travel), in a manner that adversely affected the terms and conditions of her employment, paying her less than similarly situated male coaches, and subjecting her to disparate treatment and disparate discipline.

265.   Defendant Stansbury violated Coach Joseph's constitutional right to be free from sex discrimination in employment by terminating her employment because of sex. Defendants Lewis and Engel, by furnishing false and misleading information, contributed to that decision.

266.   Defendant Peterson, acting under the color of state law, violated Coach Joseph's constitutional right to be free from sex discrimination in employment, because he was in a position of authority to take responsive action to stop the violations of Coach Joseph's constitutional rights as described above, he knew about the violations of Coach Joseph's rights, yet he failed to act, thereby acquiescing in the discriminatory conduct and causing the discrimination against Coach Joseph to persist and worsen.  Defendant Peterson's failure to act in the face of known violations of Coach Joseph's constitutional rights amounted to deliberate indifference.

267.   As a direct result of the actions, statements and/or policies of the Individual Defendants, Coach Joseph has suffered an unconstitutional deprivation of her rights under 42 U.S.C. § 1983 and the Fourteenth Amendment to the U.S. Constitution.

268.   The Individual Defendants acted intentionally and with callous disregard for Coach Joseph's known statutory and constitutional rights.

269.   The Individual Defendants' conduct described above has directly and proximately caused, and continues to cause, Coach Joseph to suffer loss of income and other financial benefits, a loss of future professional opportunities and future income, pain and suffering, humiliation, personal embarrassment, and damage to her professional reputation.

## COUNT FOUR:

**Unlawful Retaliation in Violation of Title IX of the Education Amendments Act of 1972, 20 U.S.C. §§ 1681, *et seq.* Against Defendants GTAA and Board of Regents.**

270.   Paragraphs 1 through 247 above are hereby incorporated as though each of the factual allegations was restated.

271.   Title IX and its implementing regulations prohibit retaliation against an employee for her opposition to Title IX discrimination or participation in a Title IX proceeding.

272.   At all times relevant to this Complaint, Defendants GTAA and Board of Regents were an employer and a recipient of federal funding within the meaning of Title IX and its implementing regulations.

273.   At all times relevant to this Complaint, Coach Joseph was an education-related employee of a recipient of federal funding within the meaning of Title IX and its implementing regulations.

274.   Coach Joseph engaged in protected activity by opposing treatment that she reasonably believed constituted unlawful discrimination under Title IX and its implementing regulations, including opposing and reporting Defendants GTAA's and Board of Regents' disparate funding and treatment of the WBB program, including in the November 21, 2018, Letter, February 8, 2019 Complaint, and February 22, 2019 Letter, and opposing and reporting discrimination on the basis of sex in employment in a federally funded education program.

275.   Defendants GTAA and Board of Regents were aware of Coach Joseph's protected activity.

276.   Defendants GTAA and Board of Regents took adverse action against Coach Joseph, including subjecting her to several unfounded investigations, delaying the renewal of her contract, refusing to investigate her complaints of discrimination and retaliation, suspending her, terminating her employment, and

engaging in post-termination acts of retaliation, such as circulating the March 20 Report to press outlets and making false statements to the press regarding Coach Joseph's violations of NCAA rules or regulations.  Defendants GTAA's and Board of Regents' retaliatory actions were such that they would have dissuaded a reasonable employee from making or supporting a charge of discrimination.

277.   The adverse actions taken by Defendants GTAA and Board of Regents against Coach Joseph were casually connected to Coach Joseph's protected activity.

278.   Defendants GTAA's and Board of Regents' actions described above have directly and proximately caused, and continue to cause, Coach Joseph to suffer loss of income and other financial benefits, a loss of future professional opportunities and future income, pain and suffering, humiliation, personal embarrassment, and damage to her professional reputation.

### COUNT FIVE:

### Unlawful Retaliation in Violation of the Georgia Whistleblower Act, O.C.G.A. § 45-1-4 Against Defendants GTAA and Board of Regents.

279.   Paragraphs 1 through 247 above are hereby incorporated as though each of the factual allegations was restated.

280.   The Georgia Whistleblower Act ("GWA") prohibits a public employer from retaliating against a public employee who discloses a violation or

noncompliance with a law, rule, or regulation to a supervisor or government agency, or who objects to any activity, policy, or practice of the public employer that the public employee has reasonable cause to believe is in violation of or noncompliance with the law. O.C.G.A. § 45-1-4.

281.   Defendants GTAA and Board of Regents are public employers within the meaning of the GWA.

282.   Coach Joseph is a public employee within the meaning of the GWA.

283.   Coach Joseph's reports of various supervisors and Defendant Peterson regarding Defendants GTAA's and Board of Regents' unlawful conduct, including unlawful discrimination on the basis of sex in violation of federal law, as set forth herein, constituted protected disclosure of a violation of or noncompliance with a law, rule, or regulation to either supervisor or a government agency.

284.   Plaintiff Joseph's conduct of objecting to practices by GT and Defendants GTAA that she reasonably believed were discriminatory and retaliatory in violation of federal law, as set forth herein, constituted objecting to, or refusing to participate in, any activity, policy, or practice of the public employer that the public employee has reasonable cause to believe is in violation of or noncompliance with a law, rule, or regulation.

285.  Defendants GTAA and Board of Regents were aware of Coach Joseph's protected activity.

286.  Defendants GTAA and Board of Regents took adverse employment actions against Coach Joseph, including subjecting her to several unfounded investigations, suspending her, terminating her employment, and engaging in post-termination acts of retaliation, such as circulating the March 20 Report to press outlets and making false statements to the press regarding Coach Joseph's violations of NCAA rules or regulations.

287.  The adverse employment actions taken by Defendants GTAA and Board of Regents against Coach Joseph were casually connected to Coach Joseph's protected disclosures and opposition activity.

288.  Defendants GTAA's and Board of Regents' actions described above have directly and proximately caused, and continue to cause, Coach Joseph to suffer loss of income and other financial benefits, a loss of future professional opportunities and future income, pain and suffering, humiliation, personal embarrassment, and damage to her professional reputation.

## COUNT SIX:

**Retaliatory Hostile Work Environment in Violation of Title IX of the Education Amendments Act of 1972, 20 U.S.C. §§ 1681, *et seq.* Against Defendants GTAA and Board of Regents.**

289.   Paragraphs 1 through 247 above are hereby incorporated as though each of the factual allegations was restated.

290.   Title IX and its implementing regulations prohibit retaliation against an employee for her opposition to Title IX discrimination or participation in a Title IX proceeding.  This prohibition against retaliation includes a prohibition against subjecting an employee to a retaliatory hostile work environment because of her protected activity.

291.   At all times relevant to this Complaint, Defendants GTAA and Board of Regents were an employer and a recipient of federal funding within the meaning of Title IX and its implementing regulations.

292.   At all times relevant to this Complaint, Coach Joseph was an education-related employee of a recipient of federal funding within the meaning of Title IX and its implementing regulations.

293.   Coach Joseph engaged in protected activity by opposing treatment that she reasonably believed constituted unlawful discrimination under Title IX and its implementing regulations, including opposing and reporting Defendants

GTAA's and Board of Regents' disparate funding and treatment of the WWB program, including in the November 21, 2018 Letter, February 8, 2019 Complaint, and February 22, 2019 Letter, and opposing and reporting discrimination on the basis of sex in employment in a federally funded education program.

294.   Defendants GTAA and Board of Regents were aware of Coach Joseph's protected activity.

295.   In response to Coach Joseph's protected activity, Defendants GTAA and Board of Regents subjected her to a pattern of retaliatory harassment that was sufficiently severe and pervasive so as to alter the terms and conditions of her employment and create a hostile work environment.

296.   Defendants GTAA and Board of Regents at all relevant times knew or should have known of the retaliatory actions being taken against Coach Joseph.

297.   Defendants GTAA and Board of Regents failed to take necessary action to prevent or correct the retaliatory harassment and, in fact, ratified such conduct.

298.   Defendants GTAA's and Board of Regents' actions described above have directly and proximately caused, and continue to cause, Coach Joseph to suffer loss of income and other financial benefits, a loss of future professional

opportunities and future income, pain and suffering, humiliation, personal embarrassment, and damage to her professional reputation.

## COUNT SEVEN:

### Breach of Contract Against Defendants GTAA and Board of Regents

299.   Paragraphs 1 through 247 above are hereby incorporated as though each of the factual allegations was restated.

300.   Defendant GTAA and Coach Joseph were parties to a valid contract, the Employment Contract, executed on October 20, 2014.   Under the terms of the Employment Contract, GT/Board of Regents agreed to employ Coach Joseph until March 31, 2020 unless terminated earlier for Good Cause.   *See* Preamble ("the Georgia Institute of Technology…employs JOSEPH as Head Women's Basketball Coach); Article I ("This Contract is for a term of six (6) years…ending March 31, 2020"); Article VII ("This Contract will terminate if…Good Cause exists for such termination.").

301.   On March 26, 2019, Defendants GTAA and Board of Regents terminated Coach Joseph's Employment Contract with Defendant GTAA without Good Cause.

302.   By terminating Coach Joseph's Employment Contract prior to March 31, 2020 without Good Cause, Defendants GTAA and Board of Regents materially breached Articles I and Articles VII of the Employment Contract.

303.   Defendants actions described above have directly and proximately caused, and continue to cause, Coach Joseph to suffer significant economic damages.

## COUNT EIGHT

### Claim for Expenses of Litigation under O.G.C.A. § 13-6-11, Against All Defendants

304.   Paragraphs 1 through 247 above are hereby incorporated as though each of the factual allegations was restated.

305.   Under O.G.C.A. § 13-6-11, a successful plaintiff may recover her attorneys' fees and other expenses of litigation where she specifically pleads and proves that the defendant has acted in bad faith, has been stubbornly litigious, or has caused the plaintiff unnecessary trouble and expense.

306.   The Institutional and Individual Defendants acted in bad faith and caused Coach Joseph unnecessary trouble and expense by knowingly and intentionally discriminating against Coach Joseph on the basis of her sex in her terms and conditions of employment, terminating Coach Joseph's contract in bad faith and for a dishonest purpose in retaliation for her protected activity and in

breach of its terms, and publishing false allegations of egregious misconduct to harm Coach Joseph's reputation.

307.   As a direct and proximate result of Defendants' bad faith violation of Coach Joseph's rights, Coach Joseph has suffered unnecessary trouble and expense.  These damages include court costs, reasonable attorneys' fees, and other litigation expenses, in an amount to be determined at trial by a jury.

## REQUESTED RELIEF

WHEREFORE, Coach Joseph demands a TRIAL BY JURY and for the following relief:

308.   A declaratory judgment that the Institutional Defendants have engaged in unlawful discrimination on the basis of sex and retaliation in violation of Title IX and the GWA;

309.   A declaratory judgment that the Institutional Defendants breached their with contract Coach Joseph without Good Cause;

310.   A declaratory judgment that the Individual Defendants have engaged in unlawful discrimination on the basis of sex in violation of the Fourteenth Amendment to the U.S. Constitution and 42 U.S.C. §1983;

311.   An injunction prohibiting the Institutional Defendants from engaging in unlawful discrimination on the basis of sex and retaliation in violation of Title IX and the GWA;

312.   Award Coach Joseph damages in an amount to be proved at trial for economic losses, damage to professional reputation, and pain and suffering that she has experienced as a result of Defendants' unlawful conduct;

313.   Award Coach Joseph punitive damages against the Individual Defendants in an amount to be proven at trial;

314.   Award Coach Joseph pre-judgment and post-judgment interest;

315.   Award Coach Joseph reasonable attorney's fees and costs; and

316.   Award Coach Joseph other and further relief as the Court may deem appropriate.

Respectfully submitted this 23 day of July, 2019.

/s/Edward D. Buckley_____
Lisa J. Banks*
banks@kmblegal.com
Colleen E. Coveney*
Georgia Bar No. 686460
coveney@kmblegal.com
Joseph Abboud*
abboud@kmblegal.com
**Katz, Marshall & Banks, LLP**
1718 Connecticut Avenue, NW, Sixth Floor
Washington, D.C. 20009

Phone: (202) 299-1140
Fax:     (202) 299-1148

*(pro hac vice motion forthcoming)*

Edward D. Buckley
Georgia Bar No. 092750
edbuckley@buckleybeal.com
T. Brian Green
Georgia Bar No. 801098
bgreen@buckleybeal.com
**Buckley Beal LLP**
600 Peachtree Street NE, Suite 3900
Atlanta, GA 30308
Telephone: (404) 781-1100
Facsimile:  (404) 781-1101